[Civ. No. 739. Fourth Appellate District.—February 15, 1932.]

LILLIAN DIFFERDING, Appellant, v. E. E. BALLAGH, as Receiver, etc., Respondent.

R. W. Henderson for Appellant.

Aldrich & Mack and J. Karl Lobdell for Respondent.

MARKS, J.—This is an action instituted to establish the claim of appellant to a five per cent "over-riding royalty" clear of operating and maintenance expenses, in the oil, gas

or other hydrocarbon substances produced from 120 acres of land described in a government oil lease in Kern County, California. The terms of the lease are similar to those usually found in government oil leases executed at about the same time. Counsel have assumed that the term "over-riding royalty" means a certain percentage of the gross production of an oil or gas producing property, payable to some person other than the lessor or those claiming under him. Respondent is the receiver in charge of the real property from which appellant claims her royalty.

The Gross Drilling Company was, in its inception, an organization possessing the characteristics of a "Massachusetts Trust". The declaration of trust under which it was organized was apparently executed in December, 1923, and provided for the issuance of 1,000 shares or certificates of beneficial interest of the par value of $100 each. Its trustees were Rudolph Grossenbacher, Charles A. Differding, husband of appellant, and Harry E. Shepherd. In the minutes of the organization meeting the three trustees and one Lawrence Sampson were named as the subscribers to the shares. It does not appear from the record that any shares were ever issued and the name of Sampson does not otherwise appear. The three trustees were all beneficiaries under the declaration of trust, each claiming an equal interest in the property.

The Leland Oil Company, a corporation, was the assignee of the lessees from the United States of the 120 acres of land in Kern County from which appellant claims her royalty. This company, by a contract dated March 24, 1925, gave possession and the right to drill for oil and operate oil-wells on sixty acres of this land to the Gross Drilling Company. This will hereafter be referred to as lease No. 1. Later it executed another contract upon identical terms to the Gross Drilling Company upon the other sixty acres described in the government lease. This will be referred to as lease No. 2. In each agreement the Gross Drilling Company agreed to pay 35 per cent of the gross production to the United States and the Leland Oil Company, leaving 65 per cent of the production for the Gross Drilling Company.

On March 27, 1925, the Gross Drilling Company, in consideration of the sum of $10,000, sold to Sam Orloff seven and one-half per cent "of all oil, gas or other hydro-carbon

substances produced and saved'' from Lease No. 1. In the assignment it was provided that Orloff should pay no part of the expense of drilling the first well; that he should pay his proportionate share of the cost of drilling any additional wells; that the absolute management and control of drilling the first well should remain in the Gross Drilling Company. Identically similar assignments were executed to others, and also to the production of lease No. 2, totaling thirty-four and three-quarters per cent of the production of lease No. 1, and twenty-five per cent of the production of Lease No. 2. For want of a better name the assignees will be referred to as "production owners".

On July 28, 1925, Harry E. Shepherd, Rudolph Grossenbacher and Charles Differding, as trustees of the Gross Drilling Company, the first party, and Charles A. Differding, the second party, executed an agreement the material parts of which are as follows: "Whereas, Second Party is the owner and holder of a one-third interest of the beneficial interest of the Gross Drilling Company, a Trust Estate, First Party herein; and Whereas, Second Party is desirous of assigning all of his beneficial interest in said Gross Drilling Company to the treasury thereof, and also assigning to the treasury of First Party all of his interest in what is known as 'The Reardon Pump Patents', and First Party is desirous of giving to Second Party, in lieu of his interests, a five per cent (5%) over-riding royalty in and to the above mentioned lease held by it, as above set forth. Now, therefore, for and in consideration of the sum of Ten Dollars ($10.00), each to the other in hand paid, and the mutual promises and covenants herein contained, it is agreed as follows: 1. Upon execution hereof, Second Party will assign to First Party all of his beneficial interest in and to The Gross Drilling Company, a Trust Estate, and will assign, or cause to be assigned to First Party all of his right, title and interest in and to the Reardon Pump Patents hereinabove mentioned. 2. First Party does by these presents hereby assign, transfer and set over unto Second Party a five per cent (5%) over-riding royalty, clear of operation and maintenance expense of any nature whatsoever, in and to all oil, gas or other hydro-carbon substances produced and saved from and upon the

"South one-half (S½) of the Northwest quarter (NW¼) and the Northwest quarter (NW¼) of the Northwest quarter (NW¼) of Section 26, Township 30 South, Range 24 East, M. D. B. & M., situate in the County of Kern, State of California and containing 120 acres,

"under and pursuant to the terms of that certain agreement bearing date of the 24th of March, 1925, by and between Leland Oil Company, as First Party, and Gross Drilling Company, as Second Party; it being expressly understood that said royalty interest may be paid by the Company purchasing the oil from the First Party direct to the Second Party herein." Nowhere in the record does it appear that Differding executed any assignment of "The Reardon Pump Patents" or of his one-third beneficial interest in the trust estate, to the Gross Drilling Company. On December 29, 1925, Differding and appellant, his wife, executed an agreement whereby Differding, in consideration of the sum of $5,000 sold, assigned and transferred to Lillian Differding, her executors, administrators, and assigns, all Differding's "right, title and interest in and to that certain agreement and assignment dated the 28th day of July, 1925, wherein Harry E. Shepherd, Rudolph Grossenbacher and Charles Differding, Trustees of an unincorporated association operating and known as The Gross Drilling Company, a Trust Estate, of Los Angeles, California, are the parties of the first part therein, and Charles A. Differding, is the party of the second part therein, and recorded in the County Recorder's Office of the County of Kern, State of California, on the 4th day of August, 1925, in Book 52 of Official Records at Page 234. Giving and Granting unto the said Lillian Differding, her executors, administrators and assigns, full power and authority to collect, receive and enjoy all monies and benefits that may accrue or become due under said contract as I might or could do were these presents not executed."

It is evident that appellant would take any interest she might acquire under this assignment subject to all equities which might be urged against her husband and that in bringing this action she stood in no better position than that which Differding would have occupied had he been the plaintiff in her stead. Differding testified that his interests in the trust estate and "The Reardon Pump Patents", which

he was supposed to give for the overriding royalty, were worth more than $200,000 and that he sold the royalty to his wife for $5,000.

██ The findings of the court are very full and complete and it is not necessary to detail them here. They support the conclusion that the three trustees of the Gross Drilling Company occupied a position of trust and confidence toward the production owners; that a trustee cannot deal in the trust property with himself as an individual on the one hand, and himself and his cotrustees as trustees on the other, to the detriment of any other persons beneficially interested in the *corpus* of the trust; that the assignment of the overriding royalty to Differding was an act which resulted in detriment to the production owners and was therefore void. There is ample evidence in the record to sustain the findings which in turn support these conclusions. One finding is not supported by the evidence, but as it is upon an immaterial matter, in view of the conclusions we have reached, we will not consider it.

Appellant presents a long, learned and intricate brief in which she urges many grounds for a reversal of the judgment. Their soundness all depends on whether or not there was a relation of trust and confidence existing between the production owners and Differding and his two cotrustees. The question follows of whether or not the assignment of the overriding royalty to Differding resulted in detriment to the production owners. We will confine our discussion to these two questions.

██ The production owners paid approximately $68,000 to the trustees for the assignments given them. They were not entitled to possession of any portions of the leased property at least until after the first well was drilled on each sixty acres. Under the terms of the declaration of trust it might be true that they never would be entitled to possession of any of the property. Their assignments entitled each of them to only a fixed percentage of "all oil, gas or other hydro-carbon substances *produced* and *saved*" from the leased property. Their rights in the oil did not exist until it was produced and saved by the trustees on the surface of the ground. They entrusted their money, a considerable amount, to the three trustees. Their chances for "returns" upon their "investments", assuming that oil existed as was

later proven, depended entirely upon the skill, industry, intelligence, honesty and integrity of the trustees. The trustees had the money and independent power in the manner of its expenditure in drilling the two oil-wells. The production owners were given no rights by their contracts to even advise on these matters. If these facts did not create a condition in which the elements of trust and confidence between two groups must have existed, it would be hard to imagine one that did. It is admitted that no oil-well had been drilled to completion on either of the leases on July 28, 1925, the date of the attempted assignment of the overriding royalty to Differding. Up to that time, certainly, the production purchasers had no voice in the operations on the leases, regardless of what rights might have accrued to them after production was obtained.

It must be admitted that the record is barren of any testimony to the effect that the trustees expressly agreed to use the money received from the production owners in drilling the first wells on leases No. 1 and No. 2. However there is ample evidence which would support the inference that the money was to be used to drill these wells. Each assignment by its terms provided that it did not create any obligation on the part of the trust estate to the assignee, to drill a well upon the leased property. The obligation of the trust estate to drill the first well on each lease had been created by its prior agreement with the Leland Oil Company, which was particularly referred to in each assignment. Because the assignment contained the foregoing covenant against the creation of a similar obligation to drill a well in favor of the assignee, such a covenant should not be held to negative the inference from the other evidence, of an implied agreement on the part of the trust estate and its trustees to use the money received from each assignee in drilling the first well on each lease and in putting it on production if oil were discovered. If such an implied covenant and an agreement so to do did not exist, then the trustees must be found to have sold an interest in something that did not exist and which they were under no obligation to attempt to bring into being. Orloff and his associates were assigned only a given percentage in "all oil, gas or other hydro-carbon substances produced and saved" from the leased premises. If the trustees should be held under no

obligation to drill any wells on the leases, then the production owners paid their money for something which had no existence and which they could not require anyone to attempt to bring into existence. In the light of reason and ordinary business customs we do not think the transactions should be so construed. We are not speaking of the legal relations existing between the production owners on the one side and the trust estate and its trustees on the other after production of oil was obtained on the leased property. We are not called upon to consider this question as the assignment to Differding was made before the discovery of oil.

From what we have said we believe that a voluntary trust with the production owners as beneficiaries, and the trustees of the Gross Drilling Company as trustees, was created by the payment of the various sums of money by the production owners, with an implied covenant on the part of the trustees to use the money to develop oil production on the leased property if it was oil bearing. This brings these parties within the provisions of sections 2216 and 2219 of the Civil Code.

Having reached the conclusion that a relation of trust and confidence existed between the trust estate and its trustees on the one hand and the production owners on the other, it is obvious that we must agree with the trial court in holding that the assignment of the five per cent overriding royalty to Differding by himself and his two trustees was wholly void. When a trustee attempts to transfer to himself, as an individual, property of the trust, the transaction is void. The rule is thus stated in 25 California Jurisprudence, 136: "If, acting in his fiduciary capacity, the trustee has assumed to deal with himself as an individual, the transaction will be held to be invalid. The rule is absolute; it does not depend upon any showing of bad faith on the part of the trustee, or injury to the trustor or principal. While issues in respect of the fairness of the transaction may be determinative of the controversy in the absence of any fiduciary or trust relationship, when this relationship is disclosed, any inquiry in this respect is at an end." This rule is supported by a long line of California cases. It is not shown that any of the production owners knew of this attempted transfer to Differding or consented thereto.

That the transfer to Differding of the five per cent overriding royalty, from the sixty-five per cent of the production from the leases, would adversely affect the interest of the production owners is obvious. It reduced the quantity of oil from which the operating and maintenance costs of the leases could be paid. The receiver's reports in the record show that sixty-five per cent of the production was not sufficient to pay these costs. It is obvious that with only sixty per cent of the production left to pay these expenses, a larger deficit would result.

Judgment affirmed.

Barnard, P. J., and Jennings, J., concurred.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on April 14, 1932.