[Civ. No. 2508. Fourth Appellate District.—February 28, 1940.]

W. L. PAYNE et al., Appellants, v. C. B. CALLAHAN et al., Respondents.

A. E. Garten and Vern E. Garten for Appellants.

Pease & Dolley, Robert M. Pease, Roy P. Dolley and Adolph H. Levy for Respondents.

MARKS, J.—This is an appeal from a judgment against plaintiffs in an action wherein they sought to quiet their titles to one quarter of one per cent in each, in the hydrocarbons "produced in and under" certain real estate in the Santa Fe Springs Oil District in Los Angeles County; for an accounting, and for other relief not necessary to specify here.

The defendant Callahan is the same person who was the plaintiff Callahan in the case of *Callahan* v. *Martin*, 3 Cal. (2d) 110 [43 Pac. (2d) 788, 101 A. L. R. 871], and the same land and lease are involved in both actions. There is this important difference in the two cases: Defendant Martin in the earlier case claimed and was held to have an interest in the land by virtue of an assignment by the landowner (Gonzales) of a percentage of his royalty reserved in the oil lease, while the plaintiffs here claim an interest in the land by reason of assignments of fractional parts of the lessee's portion of the production from the same property and under the same lease. We will hereafter refer to the royalty to be paid to the landowner and his assignees as the "landowner's royalty" and the percentage to be paid by virtue of an assignment or reservation by the lessee of a portion of the production as "overriding royalty".

On July 28, 1922, Jose Gonzales, by his guardian *ad litem,* leased the land in question to Roy Sloan, F. E. Glazier and David Stewart Patterson for the purpose of drilling for and recovering hydrocarbons, for a term of twenty years "and so long thereafter as oil, gas, or other hydrocarbon substances are produced thereon in paying quantities". This lease was recorded on August 1, 1922. By assignment, dated July 25, 1922, and recorded August 1, 1922, Sloan, Glazier, Patterson and their wives assigned this lease to C. W. Elliott reserving to themselves eight and one-third per cent of the production. By an instrument dated July 31, 1922, and recorded August 9, 1922, Elliott assigned to F. B. Whitlow one-half of one per cent "of the gross production of all oil, gas and other hydrocarbon substances produced from the said premises, hereafter described, under the beforementioned original lease, after first deducting the amount of said oil or gas required under the terms of said lease for drilling or pumping operations thereon". Under date of October 12, 1922, recorded October 17, 1922, Whitlow and wife did "sell, transfer, assign, set over and deliver unto W. L. Payne all my right, title and interest in and to one-fourth of one per cent ($\frac{1}{4}$ of $1\%$) of the gross production of all oil, gas and other hydrocarbon substances produced from the premises hereinbefore described under the terms of the beforementioned original lease". By another assignment, similar in terms, date and date of recordation, Whitlow and his wife assigned a like interest to W. R. Clements.

Under date of September 22, 1922, recorded October 6, 1922, Elliott quitclaimed all of his right, title and interest in the leased land and assigned the lease to E. L. Petitfils who, with his wife, under date of September 25, 1922, recorded October 6, 1922, assigned the lease to United States Royalties Company, reserving to themselves an overriding royalty and also reserving other specified overriding royalties including the one-half of one per cent assigned to Whitlow.

The United States Royalties Company drilled a well on the property which produced oil until about June 10, 1929.

On May 29, 1929, Gonzales and wife conveyed the property to John F. Tracey, "subject to conditions, restrictions, reservations, easements, rights and rights of way of record", and on June 6, 1929, Tracey conveyed the property to C. B.

Callahan subject to "conditions, restrictions, reservations, rights, rights of way and easements of record".

By a quitclaim deed dated May 28, 1929, and recorded June 19, 1929, the United States Oil & Royalties Company (the name of the United States Royalties Company had been changed) quitclaimed the leased property to Gonzales and wife. Other instruments were executed by Callahan and the United States Oil & Royalties Company at about the same time which require no mention here.

Under date of July 11, 1929, Callahan executed an oil lease to the Third Twin Bell Syndicate for a term of twenty years "and so long thereafter as oil or gas can be produced on the leased premises in paying quantities". This lessee drilled a well on the leased land which was brought into production. Plaintiffs claim a percentage of the production of this second well, drilled under the second lease, by virtue of the assignments made while the first lease was in force. They were paid their full proportion of the production from the first well.

Upon these facts the trial court rendered judgment for defendants and this appeal followed.

■ The trial court found there was no fraud in the cancellation of the first lease and in the making of the second. This finding is conclusive here as there is no evidence of any fraud except such inferences as might be drawn from the dates of the various instruments executed and recorded in 1929. To upset such a finding on appeal there should be more satisfactory evidence of fraud than such mere inferences.

Up to the time of the decision of the case of *Callahan* v. *Martin, supra,* there was much uncertainty in this state on the question of the exact interest which the lessee in an oil lease acquired in the leased property. In *Brookshire Oil Co.* v. *Casmalia etc. Co.,* 156 Cal. 211 [103 Pac. 927], it was held that such a lease "does not vest in the so-called lessees any present title in the land. It grants only the right to do certain things thereon and to take certain mineral substances therefrom, and no title to such substances passes from the original owner until the same is severed from the realty. In regard to such agreements it is said: 'The title is inchoate and for purposes of exploration only, until oil is found. If it is not found, no estate vests in the lessee, and his title,

whatever it is, ends when the unsuccessful search is abandoned. If oil is found, then the right to produce becomes a vested right, and the lessee will be protected in exercising it in accordance with the terms and conditions of the contract.' (*Venture Oil Co.* v. *Fretts,* 152 Pa. St. 451, 460 [25 Atl. 732] . . . )'' This rule, with slight variations, was followed in several cases.

In *Callahan* v. *Martin, supra,* it was held for the first time that in California an oil lease for an indefinite term, that is for a term of years and as long thereafter as oil or gas may be found in the leased land, created in the lessee a *profit à prendre* in gross which in itself is real property, a freehold interest in land; that a lease for a definite term of years is a chattel real and while creating an interest in real property, is personal property.

The Callahan case rejected what has been called the oil in place doctrine which prevails in several oil producing states. Because oil possessed a ''fugacious, vagrant nature'' it was held that ''the owner of land does not have an absolute title to oil and gas in place as corporeal real property, but, rather, the exclusive right on his premises to drill for oil and gas, and to retain as his property all substances brought to the surface on his land''.

It was also held that a *profit à prendre* in gross, a freehold interest, was subject to assignment either in whole or in part and that such assignment conveyed to the assignee an interest in real property that was a freehold estate and a *profit à prendre* in gross; that the assignor and assignee became tenants in common in the freehold. As the court had before it only an assignment of a portion of the landowner's royalty these statements are only applicable to such assignments by landowners.

It was also held that the doctrine of potential possession of personal property was abolished by the Uniform Sales Act adopted in 1931. (Sec. 1725, Civil Code.)

The holdings in *Callahan* v. *Martin, supra,* have been followed and applied to various states of facts in the following cases, among others: *Standard Oil Co. of California* v. *John P. Mills Organization,* 3 Cal. (2d) 128 [43 Pac. (2d) 797]; *Dabney-Johnston Oil Corp.* v. *Walden,* 4 Cal. (2d) 637 [52 Pac. (2d) 237]; *Dabney* v. *Edwards,* 5 Cal. (2d) 1 [53 Pac.

(2d) 962]; *Schiffman* v. *Richfield Oil Co.*, 8 Cal. (2d) 211 [64 Pac. (2d) 1081]; *Dougherty* v. *California Kettleman etc., Inc.*, 9 Cal. (2d) 58 [69 Pac. (2d) 155]; *Fairbairn* v. *Eaton*, 6 Cal. App. (2d) 264 [43 Pac. (2d) 1113]; *Denio* v. *Brennecke*, 6 Cal. App. (2d) 678 [45 Pac. (2d) 229]; *George* v. *Weston*, 26 Cal. App. (2d) 256 [79 Pac. (2d) 110]; *Scheel* v. *Harr*, 27 Cal. App. (2d) 345 [80 Pac. (2d) 1035]; *Morrow* v. *Coast Land Co.*, 29 Cal. App. (2d) 92 [84 Pac. (2d) 301]; *Lever* v. *Smith*, 30 Cal. App. (2d) 667 [87 Pac. (2d) 66]; *Pimentel* v. *Hall-Baker Co.*, 32 Cal. App. (2d) 697 [90 Pac. (2d) 588]; *Sandrini* v. *Branch*, 32 Cal. App. (2d) 707 [90 Pac. (2d) 593; *Macklin* v. *Brittain, ante*, p. 120 [98 Pac. (2d) 749]. Some of these cases, with others to be later cited and considered, are concerned with overriding royalties created out of the lessee's estate in the leased property.

Interesting comments on the rules announced in these cases, with many citations of additional authorities, are to be found in 25 Cal. Law Review, 220; 26 Cal. Law Review, 481; 27 Cal. Law Review, 192; 9 So. Cal. Law Review, 299, and 11 So. Cal. Law Review, 319.

It is clear that the rules announced in *Callahan* v. *Martin, supra,* are now the settled law in California and that the holding which we have quoted from *Brookshire Oil Co.* v. *Casmalia etc. Co., supra,* and adopted in those cases following it, must be considered as overruled.

Some of the cases following *Callahan* v. *Martin, supra,* have seemed to assume that because it was there held that the oil in place doctrine did not prevail in California and because it was also held that the landowner did "not have an absolute title to oil and gas in place" but the right to drill "and to retain as his property all substances brought to the surface on his land", the landowner or his lessee had no lawful interest in the oil under the surface, but only a property right in the oil after it was captured and brought to the surface of the ground. Considerable doubt is cast on the correctness of this assumption not only by the above quoted language from *Callahan* v. *Martin, supra,* in which it was said that the owner did not have an *absolute title* to the subterranean oil, but in which it was not held that the owner had no interest in it at all, but also by the several slant drill-

ing cases decided in recent years. (See, *Pacific Western Oil Co.* v. *Bern Oil Co.*, 13 Cal. (2d) 60 [87 Pac. (2d) 1045]; *People* v. *Brunwin*, 2 Cal. App. (2d) 287 [37 Pac. (2d) 1072]; *Union Oil Co.* v. *Mutual Oil Co.*, 19 Cal. App. (2d) 409 [65 Pac. (2d) 896]; *Union Oil Co.* v. *Reconstruction Oil Co.*, 20 Cal. App. (2d) 170 [66 Pac. (2d) 1215]; *A. E. Bell Corp.* v. *Bell View Oil Synd.*, 24 Cal. App. (2d) 587 [76 Pac. (2d) 167].)

On proper occasion it may be necessary to further clarify the quoted statements in *Callahan* v. *Martin, supra* (sufficient for that case), especially as construed in other cases, by going into greater detail and exactness of definition. It was suggested in 27 California Law Review, 192, that the landowner might be held to have a qualified ownership in the subsurface oil. Any such qualified ownership would, of course, be subject to defeasance if the oil left the subsurface of his land either through being drawn off by another well wholly within another's land or by causes which were the result of natural phenomena. Of course, such qualified ownership would ripen into actual ownership if the oil was brought into possession at the surface by the owner or his lessee.

There are several cases which consider the interest or estate of an owner of an overriding royalty. They are not in complete harmony with each other and require our consideration.

The first of these cases is *Western Oil etc. Co.* v. *Venago Oil Corp.*, 218 Cal. 733 [24 Pac. (2d) 971, 88 A. L. R. 1271]. This case involved the rights of overriding royalty owners who acquired their interests prior to 1931 from F. M. Miller, an assignee of the lessee, to participate in the production of an oil well brought to production by the Venago Oil Corporation, a successor to Miller, with notice of the outstanding overriding royalties. The Supreme Court upheld the rights of the overriding royalty owners to receive their shares in the production of the well under the doctrine of potential possession of personal property, and said:

"It is settled law that the lessee under an oil and gas lease acquires no title to the oil and gas in place as part of the realty, but only a right to enter upon the land, drill wells, and reduce the oil and gas to possession. When reduced to

possession the oil and gas are personal property, and only then can absolute title vest in the lessee.''

The Supreme Court there approved and quoted from the cases of *Merrill* v. *California Pet. Corp.*, 105 Cal. App. 737 [288 Pac. 721], *Black* v. *Solano Co.*, 114 Cal. App. 170 [299 Pac. 843], and *Jones* v. *Pier*, 124 Cal. App. 444 [12 Pac. (2d) 646], where similar overriding royalties were held valid and binding obligations of the operating lessees with notice, for similar reasons, namely, the doctrine of the potential possession of personal property.

Of course, these cases are in conflict with the rule of *Callahan* v. *Martin, supra,* that the lease creates in the lessee a *profit à prendre* in gross which is real property. This not only repudiates the prior rule that the lessee acquires no interest in the land and no interest in the subterranean oil or gas, but only the right to drill for it, but also destroys the applicability of the potential possession of personal property theory that formed the basis of numerous prior decisions. However, there is nothing in any of those earlier cases to indicate that any of the courts deciding them would have held any of the overriding royalties void as against an operating lessee with notice, had the *Callahan* v. *Martin, supra,* rules then been announced. In fact it seems to us that it would have been easier to have upheld the legality of the overriding royalties had it then been the law that the lessee owned a *profit à prendre,* a portion of the fee which could have been conveyed by the lessee to the purchasers of the overriding royalties. The courts would not have had to invoke the tenuous doctrine of potential possession of personal property because an owner of a portion of the fee can convey portions of his interest to others.

The case of *Smith* v. *Drake,* 134 Cal. App. 700 [26 Pac. (2d) 313], involved the right of an overriding royalty owner to participate in the production from a well drilled by a subsequent lessee without notice of the claim of the overriding royalty owner. The lease in effect at the time of the creation of the overriding royalty had been quitclaimed by the lessee and a new lease executed to the operator who brought the well to production. The judgment against the owner of the overriding royalty was affirmed. The plaintiffs there asserted that their overriding royalties were interests in land;

that the second lessee was in fact a sublessee and that the sublessee had notice of their claims. The appellate court based the affirmance on the holding that the overriding royalty was not an interest in real property, citing *Brookshire Oil Co.* v. *Casmalia etc. Co., supra, Western Oil etc. Co.* v. *Venago Oil Corp., supra,* and *Black* v. *Solano Co., supra.* It quoted the portion of the Brookshire Oil Company case to which we have already adverted, to the effect that a lessee under an oil lease did not acquire any present interest in the leased land. The Brookshire Oil Company case did not involve the interest of an overriding royalty holder. As it is in conflict with the rule of property established in *Callahan* v. *Martin, supra,* the rule relied upon as the foundation for that decision is no longer in force and the case can no longer be considered as sound authority. As the other cited cases based their reasoning on the same discarded rule they cannot now be considered as sound authority. *Smith* v. *Drake, supra,* based its holding on the rules announced in the three cited cases, which rules have been repudiated in *Callahan* v. *Martin, supra.* It follows that *Smith* v. *Drake, supra,* cannot be considered as controlling here since *Callahan* v. *Martin, supra,* and the cases following it, have completely destroyed the soundness of its reasoning and in effect disapproved its holding.

*Schiffman* v. *Richfield Oil Co., supra,* involved the question of the validity of an overriding royalty against the claim of an operating lessee with notice, which acquired a subsequent interest in the lease. The Supreme Court affirmed a judgment upholding the validity of the overriding royalty. The decision was placed on the broad principles of equity and that court expressly declined to rule on the question of whether or not the overriding royalty holder had acquired an interest in the leased land. It is true that findings to that effect were stricken out. It clearly appears that this was done to carry out the expressed purpose of not ruling on the question of the interest of the overriding royalty owner and not as an expression of any opinion upon it. Therefore, the ultimate decision in that case can afford neither aid nor comfort to either of the parties here.

*Dougherty* v. *California Kettleman etc., Inc., supra,* involved an assignment by a licensee or lessee of a portion of

his royalty. The validity of the assignment was upheld. However, the leasehold interest was for a definite term of years and a chattel real, or personal property (*Dabney* v. *Edwards, supra*), which destroys the applicability of that decision to the factual situation before us.

*Fairbairn* v. *Eaton, supra,* also involved the validity of an overriding royalty. It was there held that such an interest was an estate in real property and enforceable as such.

We have found no California case, other than those already cited, which sufficiently bears on the question before us, to require special consideration. It appears that the only case bearing on the question, decided after *Callahan* v. *Martin,* is *Fairbairn* v. *Eaton, supra,* in which this court said that an assignment creating an overriding royalty "conveyed an interest in real property to the assignees". However, this holding seems to be more incidental than necessary to the ultimate conclusion there reached.

The question here presented must be considered one of first impression. Decisions in other states are in conflict and are not of sufficient importance to require detailed consideration. This case should be decided under the rules of property announced in *Callahan* v. *Martin, supra,* and the numerous cases following it.

It is not out of place to again observe that *Callahan* v. *Martin, supra,* dealing with the same property and the identical lease we are here considering, established the following facts which may not be questioned here: (1) The lease vested in the lessees and in their successors a *profit à prendre* in gross which was an interest in the leased property and was real property; (2) that an assignment of a portion of his landowner's royalty by the lessor (Gonzales) created in his assignee (Martin) a *profit à prendre* in gross which was not conveyed by a deed of the fee by Gonzales and which was an outstanding estate in the leased property against which Callahan could not quiet his title; (3) that Gonzales and Martin became tenants in common in the land. The conclusion necessarily follows that Tracey and Callahan, Gonzales' successors in interest, were also tenants in common with Martin.

The following questions remain for our decision: (1) Did the assignment by Elliott (successor of the lessees) to Whit-

low (plaintiffs' assignor) create a *profit à prendre* in the land? (2) Did Elliott and Whitlow become tenants in common in the *profit à prendre*? (3) Could the quitclaim by the United States Oil & Royalties Company, the assignee by mesne conveyances, of sixty per cent of the oil produced, saved and sold from the land, with the interest of Whitlow expressly reserved from the assignment, reconvey to the landowner the entire *profit à prendre* created by the lease and therefore cancel the lease without the consent of plaintiffs and of the owners of other overriding royalties expressly reserved in the assignment to the United States Royalties Company?

This statement of the issues to be decided injects into the case a question that seems to have been overlooked by the trial court and counsel, namely, that the assignment by Petitfils and wife to the United States Royalties Company did not attempt to assign the entire lessee's interest, but to convey only sixty per cent of the oil produced, saved and sold from the leased premises. This is so obvious that we do not feel justified in overlooking it as it should be considered on a retrial of the case.

The assignment from Petitfils and wife to the United States Royalties Company recites that the Petitfils "transfer, convey and assign all of their right, title, and interest in" the leased land and "in, to and under that certain oil and gas lease upon said real property", describing it, but reserving certain specified overriding royalties. The assignment then proceeds: "It is the intention of the parties hereto that the party of the second part (United States Royalties Company) shall have and receive after the payment of all royalties, sixty per cent (60%) of the oil produced and saved from said land . . . " The forty per cent royalties reserved from assignment, appear to be the following: Landowners royalty, 16⅔ per cent, overriding royalties; 8⅓ per cent, in original lessees, 1 per cent assigned by Elliott to D. W. Neet, ½ of 1 per cent assigned by Elliott to Whitlow (plaintiffs' assignor), 13½ per cent, subject to possible deductions, reserved to Petitfils.

It should also be observed that the assignment from Gonzales to Martin which was held to create a *profit à pren-*

*dre* in Martin (*Callahan* v. *Martin, supra*) differs from the assignment of the overriding royalty we are considering in this: The assignment to Martin was not limited to the term of any existing lease while the assignments here were limited to the term of the then existing lease. However, there are other assignments of landowners' royalties set forth in others of the cited cases which were almost identical with the assignments of the overriding royalties we are considering. Those assignments were held in those other cases to create a *profit à prendre* in the assignees. The Gonzales lease was for an indefinite period. The assignments, Elliott to Whitlow, and Whitlow to plaintiffs, were for the term of that lease which would, therefore, be for an indefinite period. It follows that because the assignments here were limited to the term of an existing lease which was for an indefinite period, the mere fact that the assignments were so limited to the indefinite term of that lease cannot support the argument that a *profit à prendre* was not created in the assignees.

■ If an assignment by a landowner of a portion of his reserved royalty under a lease, for an indefinite term, creates in the assignee a *profit à prendre* which is a part of the freehold, a similar assignment by the lessee, the owner of the *profit à prendre* in gross, should create a similar estate in the assignee. Similar conveyances carving estates out of the same property should create like estates. Any other conclusion would be most illogical. We, therefore, conclude that where, as here, the lessee, the owner of a *profit à prendre* in gross created by an oil lease indefinite in its term, assigns an overriding royalty for the indefinite term of that lease, he conveys to his assignee a part of his *profit à prendre* in gross which is real property and limited in duration to the life of the lease.

In *Merrill* v. *California Pet. Corp., supra,* it was held that the owner of an overriding royalty became a tenant in common with the lessee. However, that case was decided under the potential existence of personal property theory in vogue before the decision of *Callahan* v. *Martin, supra,* which detracts from the weight of its holding.

In *Schiffman* v. *Richfield Oil Co., supra,* the Supreme Court, by way of *dicta,* expressed the following opinion:

"The effect of the above decisions is that an owner of land may create a cotenancy in the right which he has to drill for and produce oil. If the landowner may do this, a lessee to whom the landowner has transferred the exclusive right to drill for and produce oil during the term of the lease, is also in a position to create a cotenancy in the right of profit to produce oil, to continue during the term of the lease. (See, 25 Cal. Law Review 229.)"

By analogy, as well as upon well-recognized principles of law, we are impelled to hold that the owner of the overriding royalty here involved, and his successors in interest, became cotenants in the *profit à prendre* with the lessees and their successors in interest. It is axiomatic that like causes should produce like results. If the assignee of the landowner became a tenant in common with him (*Callahan* v. *Martin, supra,* and other cases cited), there should be no escape from the conclusion that the assignee of the lessee and the lessee would become like cotenants. (See, also, 7 Cal. Jur., p. 340 et seq., and cases cited.)

It is well settled that "a tenant in common property has the right to dispose of his own undivided share, but he may not sell the whole property, nor any portion thereof, except his own, and if he undertakes to dispose of any larger interest his coowners are not bound thereby". (7 Cal. Jur., p. 357.) This well-recognized rule was applied in *Callahan* v. *Martin, supra,* where it was held that the attempted conveyance of the entire fee by Gonzales did not convey the interest of his cotenant Martin. We therefore conclude that the deed from the United States Oil & Royalties Company to Gonzales only conveyed to that grantee the interest of the grantor in the leased land which was only "sixty per cent (60%) of the oil produced and saved from said land". It could not and did not convey the interests of plaintiffs who were then tenants in common with that grantor.

It follows as a natural consequence from what we have said,. that the new lessees, defendants here, excepting Callahan, only acquired such interest in the leased property as their lessor, Callahan, had to give them, the assignments to Whitlow and plaintiffs having been recorded and the new lessees thus having had constructive notice of them. Plain-

tiffs, therefore, are entitled to share in the present production of hydrocarbons from the leased property.

Defendants argue that as the assignments to plaintiffs were only for the term of the original lease and as that lease gave to the lessees the right to quitclaim the leased property, the interests of plaintiffs fell with the quitclaim of the leased property by the operating lessee. At the time the lease was executed, if the lessees had assigned no overriding royalties to others, their right to quitclaim and surrender the leased property could not then be questioned. When they voluntarily created others as cotenants with them in the leasehold estate they thereby limited and restricted their right to terminate the lease by their own quitclaim. By operation of law that right became vested in themselves and their cotenants. It could not be exercised by one cotenant any more than by another. Neither could reconvey the estate of the other. It would be just as logical to give to plaintiffs, small fractional owners, the right to quitclaim and terminate the lease without the consent of their cotenants as to give the same right to the oil company, the owner of sixty per cent of the production, without the consent of plaintiffs and its other overriding royalty cotenants who seemingly owned $23\frac{1}{3}$ per cent of the production. We agree with defendants in their argument that the overriding royalties would not survive the lawful termination of the lease but cannot agree with the premise upon which that argument is based, that the lease was legally terminated.

Defendants urge a re-examination of that portion of the decision of *Callahan* v. *Martin, supra,* and other cases following it, holding that the assignee of a portion of the landowner's royalty receives a *profit à prendre* by virtue of the assignment and becomes a tenant in common in the freehold. They argue that two of the elements essential to the creation of a true *profit à prendre* in gross are lacking in the case of such assignment and that, therefore, such assignee should not be held to have received such an estate in the leased land by virtue of the assignment. Those missing elements are, possession of the land, and the right to remove hydrocarbons from the land. They argue that there was no intention to give an assignee of a fractional interest in the production the right to possession of sufficient surface of the land for drill-

ing operations, nor the right to drill for and remove hydrocarbons through the soil; that the lease vests those rights in the operating lessee to the exclusion of all others.

 The briefs containing the foregoing arguments were filed while this case was pending in the Supreme Court. The request to re-examine the announced rules and the argument supporting such a request were entirely proper while the case was pending in the Supreme Court. They became inappropriate after the transfer of the case to the District Court of Appeal.

These arguments by defendants overlook one of the prominent features of the estate in cotenancy, namely, that the lawful possession of one cotenant is the possession of all cotenants and also the peculiar nature of the cotenancy in oil producing lands. These questions were considered in *Dabney-Johnston Oil Corp.* v. *Walden, supra,* where the Supreme Court said:

"The rights of those who are tenants in common in oil rights in land are the subject of annotation in 40 A. L. R. 1400, note appended to *Prairie Oil & Gas Co.* v. *Allen,* 2 Fed. (2d) 566 [40 A. L. R. 1389], and 91 A. L. R. 205, note appended to *Earp* v. *Mid-Continent Petroleum Corp.,* 167 Okl. 86 [27 Pac. (2d) 855, 91 A. L. R. 188]. It is there pointed out that in some jurisdictions it is waste for one tenant in common to go upon the land and produce oil without the consent of the other cotenants. But the more generally prevailing rule, as announced in the cases to which the notes are appended, is to the effect that a tenant in common has the right to go upon the lands and produce oil, provided he does not exclude other cotenants, but must account to cotenants for their respective percentages. A tenancy in common is characterized by a single unity, that of possession, or of the right to possession. . . .

"The rule permitting nonproducing cotenants to share in oil produced by a single cotenant is justified by the difference in a cotenancy in mineral rights and such a tenancy in the surface estate. This rule has become well established, as indicated in the annotations to which we have referred. The propriety of the principles was recognized by this court in the early case of *McCord* v. *Oakland Q. M. Co., supra,* 64 Cal. 134, where the court said, at page 148 [27 Pac. 863, 19

Am. Rep. 686] : 'But, it may be conceded, for the purposes of this decision, that the relation of the tenants in common, under the circumstances disclosed, is *sui generis*, and their rights peculiar. That while the extraction of ore from the mine by one tenant, who does not exclude his cotenants, is not waste, and the neglect of the latter to enter should be held an assent on their part to the exclusive occupation by the former; yet, because of the effect of the exclusive working by one may be to exhaust the mineral, and the uncertainty of the prospective value of the property may render it impossible to make a just partition of it, a court of equity should order an accounting; holding that, while it must have been contemplated by the parties that the tenant in occupation should not be held for waste, nor prohibited from proceeding with his work by the cotenants who do not seek to enter, yet it must also have been contemplated that the tenant in occupation should not appropriate to himself the entire profits.' "

As the interests of the plaintiffs created in the land under the original lease were never terminated nor surrendered, and as defendants had constructive notice of those interests through the recordation statutes, it follows that plaintiffs are entitled to participate in the oil and gas produced from the leased premises.

The judgment is reversed.

Barnard, P. J., and Griffin, J., concurred.

A petition by respondents to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on April 25, 1940. Gibson, J., voted for a hearing.