**HONOLULU OIL CORPORATION,**
Appellant,

v.

**Katharine H. KENNEDY and Mark C. Elworthy, Executors of the Will of Frank Kennedy, deceased, Appellees.**

No. 15049.

United States Court of Appeals
Ninth Circuit.

June 17, 1957.

Herbert W. Clark, Morrison, Foerster, Holloway, Shuman & Clark, A. L. Gibson, San Francisco, Cal., for appellant.

Kenneth Ferguson, George A. Andrews, Jr., Pedder, Ferguson & Pedder, Harold W. Elliott, San Francisco, Cal., for appellees.

Before STEPHENS and FEE, Circuit Judges, and EAST, District Judge.

JAMES ALGER FEE, Circuit Judge.

The facts in this case are drawn from the agreed statement of facts and documentary exhibits.

This action was commenced on November 21, 1950, by Katharine H. Kennedy and Mark Elworthy (hereinafter referred to as "appellees"), as executors of the estate of Frank Kennedy, against Honolulu Oil Corporation (hereinafter referred to as "Honolulu") for damages on account of alleged underpayments to Kennedy of various oil royalties by Honolulu and its predecessors in interest. The claim of appellees is limited to underpayments for the period from July 1, 1931, to and including August 29, 1935, during which time it is claimed that an artificially depressed price for oil, rather than its real market value, was used to determine the amount of the royalties due. The parties stipulated that, if appellees are to recover at all, the amount of the judgment shall be $9,519.11, plus interest, if allowed.

Frank Kennedy was owner of some land in fee (120 acres, a quarter section) in the Kettleman Hills area of Fresno County. He also held a U. S. Oil and Gas Prospecting Permit, giving him rights over approximately 2,500 acres in the same area. On January 6, 1927, Kennedy executed four documents by which he transferred to the Kettleman Oil Corporation, a predecessor of Honolulu, his interest in these lands. As to the fee land, Kennedy reserved various land- owner's royalties (from 2½% to 4½% of the oil and gas saved) in the conveyance, and agreed to pay the taxes due on that portion reserved. The terms and conditions of the deed were to be binding upon the successors of the parties thereto, and were "to be construed as covenants running with said lands" (Exhibit A). The rights under the Prospecting Permit were assigned to Kettleman Oil Corporation by Kennedy in return for a promise to pay various overriding royalties, the provisions for which were "to be construed as a reservation of the aforesaid overriding royalties and as covenants running with the said lands" (Exhibit B). Kennedy also entered into, as "consideration" for the assignment of the rights under the permit, an overriding royalty agreement, providing for additional royalties from other lands controlled by Kettleman to be paid to Kennedy (Exhibit C). This was later amended on December 6, 1928 (Exhibit D). Finally, the parties entered into an operating agreement providing that Kettleman should have an exclusive right of entry for the purposes of developing the petroleum potential of the lands, and contained further promises by both parties relative to the mechanics of developing and exploiting the land.

On July 25, 1929, most of the operating rights in the area were transferred to the Kettleman North Dome Association, under a Unit Agreement. However, because of the terms of the Unit Agreement and the refusal of Kennedy to consent to the inclusion of the fee interest which he had conveyed within the scope of that agreement, no production allocated to any portion of that land ever became payable to Kennedy during the years involved in this case. Thus the sole source of royalties to Kennedy was the land, the rights to which were transferred by the assignment of the Prospecting Permit.

Apparently, this suit was brought as a result of the commencement and determination of an action brought by the United States Government, as landowner, to recover additional royalties alleged to.

be due because of an artificially depressed price for petroleum in the Kettleman Hills area. The government prevailed in that action. United States v. General Petroleum Corporation of California, D.C., 73 F.Supp. 225, affirmed sub nom., Continental Oil Co. v. United States, 9 Cir., 184 F.2d 802, on October 16, 1950. On January 1, 1940, Kennedy and the predecessor of Honolulu had entered into an agreement to waive the statute of limitations until the action of the government should be finally determined. The instant suit was brought shortly after the above noted affirmance.

Judgment herein was granted by the District Court, Judge Carter sitting, on cross-motions for summary judgment, for plaintiff. The court based its determination as a matter of comity on the outcome of a case, Kennedy v. Seaboard Oil Co., D.C., 99 F.Supp. 730, assumed to have been substantially similar, in which Judge Harris denied a motion to dismiss on the ground that the claim of plaintiff was not barred by the statute of limitations. Later, Judge Goodman granted summary judgment for the plaintiff Kennedy. No part of that record is before this Court, except the opinion above cited.

The answer in the present case set up the statute of limitations as an affirmative defense. It was further pleaded therein that the payments made to Kennedy were a correct share of the payments received by Honolulu and that it had fully accounted to him for his share of the oil produced.

Under the Rule, a defendant may apply for a summary judgment.

"For Defending Party. A party against whom a claim, counterclaim, or cross-claim is asserted or a declaratory judgment is sought may, at any time, move with or without supporting affidavits for a summary judgment in his favor as to all or any part thereof." Rule 56(b), Federal Rules of Civil Procedure, 28 U.S.C.A.

The District Court has indicated that the holding in this case is based upon comity rather than an independent examination of the documents and the legal principles here involved. The only opinion on the subject held that, in a similar complaint, a motion to dismiss on the ground that the statute of limitations had run would not be sustained.[1] Since the complaint here and in that instance contained allegations that there was in fact a confidential and fiduciary relationship, the holding that sufficient facts were stated to constitute a claim upon which relief might be granted was well founded. It was not a precedent, however, for a judgment for plaintiff here on the agreed facts which are before this Court for adjudication.

Another technical matter must be dealt with at the outset.

Kennedy claims throughout his brief in this case that the trial court found the existence of a confidential and fiduciary relationship between Kennedy and Honolulu as a fact. Thence, he postulates that this Court must uphold such a finding unless it is clearly erroneous. The premise from which this conclusion is deduced is not true. Here there were cross-motions for summary judgment. The very essence of such a motion by either party is that no "genuine issue of material fact" remained. Since there were no issues of material fact, there could by definition be no findings of fact. There an appellate court could give no weight to such findings, if present. The sole consideration here must be given to the question of whether the trial court drew correct legal conclusions to the facts to which the parties stipulated. The trial court expressly stated that was the basis of judgment. Further, it was stated, "rules of comity require a similar decision in this case," on account of the principles of law assumed to have been laid down in the previous case. Plaintiff is not entitled to the protection of the rule that the findings of the trial court should be upheld.

---

1. Kennedy v. Seaboard Oil Co., D.C., 99 F.Supp. 730.

By the answer of Honolulu, the defense that each claim of plaintiff is barred by certain statutes of limitations of California has been raised. These Acts are Section 337,[2] subdivision 1, and Section 343 [3] of the Code of Civil Procedure.

[2] The claim of plaintiff for royalties in addition to payments already made covers the period between July 1, 1931, up to and including August 29, 1935. The action was commenced in November, 1950. On the face of these statutes, any cause of action has been barred. However, if there were an express or implied fiduciary relationship between Kennedy and Kettelman Oil Corporation which is binding on Honolulu, the statute of limitations would not have commenced to run.

The sole question is whether there was such a confidential or trust relationship which was binding upon Honolulu. If there was, it arose in virtue of the original dealings of Kennedy and Kettleman.

A casual reading of the stipulated documents discloses that nowhere is an express trust mentioned in words. No confidential or fiduciary relation is expressly mentioned therein. Instead, the language used indicates that there were here the usual transfers or assignments with provisions for payment of royalties by the owner of the profit a prendre. The fiduciary relationship which is alleged must necessarily have arisen, if at all, from the principles governing the situation in which the parties acted and the obligations created by the agreements.

■ Plaintiff contends that all the documents must be construed together as part of the same transaction. As an abstract proposition, that is correct. It is obvious that the provisions of one document before us cannot have the effect of abrogating the legal principles applicable to an entirely different type instrument entered at the same time. A deed to one parcel of land may have connection with a mortgage on another, and have been entered into at the same time and by the same parties. But the law of deeds relates to the one and the law of mortgages to the second. So here.[4]

■ The law of California is, of course, controlling.[5] Where a landowner there gives a lease on lands for the purpose of drilling for oil and reserves a royalty, he is held to have a reversion and a right of entry under certain conditions.[6] Thus, ordinarily, by operation of law, he is held to have reserved a property right in the oil brought to the surface.[7]

■ On the other hand, the holder of a permit to explore for oil on government property may assign the permit to another, and, when that ripens into a lease, he may have a right to receive payment in kind or in cash for a percentage of the oil produced. However, since the original owner of the permit had never had title to the land or the lease, it follows that his rights are entirely dependent upon the terms of the agreement. The California courts so hold.[8]

Therefore, while the lease by Kennedy to Kettleman of lands which he held in

2. "Within four years: 1. An action upon any contract, obligation or liability founded upon an instrument in writing * *."

3. "An action for relief not hereinbefore provided for must be commenced within four years after the cause of action shall have accrued."

4. "But there is something more than the want of a connecting line between these two deeds. They do not relate to the same subject matter. It is true that they are both conveyances of land; but the parcels are separate and distinct; and each deed stands on its own independent consideration." Cornell v. Todd, 2 Denio 130, 133, 17 N.Y. Common Law Reports 78, 79.

5. The action was brought under 28 U.S. C.A. § 1332, diversity of citizenship.

6. Callahan v. Martin, 3 Cal.2d 110, 43 P.2d 788, 101 A.L.R. 871.

7. Callahan v. Martin, 3 Cal.2d 110, 124, 43 P.2d 788.

8. La Laguna Ranch Co. v. Dodge, 18 Cal. 2d 132, 137–138, 114 P.2d 351, 135 A.L.R. 546.

fee at the same time of his assignment to that same company of his permit is of historical interest, the construction of the two instruments depends upon entirely different rules of law. If the assignment of the permit and the stipulation for the payment of cash, based upon a percentage of the return, be examined in conjunction with all other documents in this case, no elements of coadventure will be found either expressly or impliedly. No inference of such an intention can be found therein.

Kennedy has no interest in Kettleman's share of the production or in the oil produced as a whole. There is no immediate duty of Kettleman to give up possession or share possession with Kennedy. There is set forth no right in Kennedy to have an accounting of all the operations from Kettleman. Kennedy adopts none of the burdens of operation.

Neither did Kettleman agree to share losses or profits [9] with Kennedy. It appears obvious that Kennedy did not want to direct or control the activities of Kettleman in the operation or possession of the properties.[10] He did not reserve a right to take over operation in the event the property were not operated to his satisfaction or in event of default by Kettleman. It must be concluded there was no community of interest in the object of the undertaking. The tests which establish the existence of joint adventure or coadventure are thus negative. Such a relationship between Kennedy and Honolulu did not exist.

It is then urged that a property interest was created in Kennedy, indefinite in duration, and therefore a trust was established. The decisions of California courts establish that a stipulation that there be an overriding royalty, consisting of a share of the produce in kind, does create an interest in real property.[11] But the conclusion that any trust or fiduciary relationship is thus created does not follow.[12]

"* * * while the operating lessee may assign an interest in his profit a prendre which is intended to make the assignee a tenant in common of his entire leasehold estate, he may, on the other hand, intend to retain in himself the operating rights contained in the profit a prendre, conveying to the assignee merely a fractional share of the oil and gas produced in the form of an overriding royalty." [13]

The instrument creating the overriding royalty interests of plaintiff is the criterion whereby it may be ascertained what was the intention. Any suggestion

---

9. Bowmaster v. Carroll, 8 Cir., 23 F.2d 825. See Beck v. Cagle, 46 Cal.App.2d 152, 161, 115 P.2d 613, 618, setting forth as prerequisites to finding joint adventure "community of interest in the object of the undertaking; (b) an equal right to direct and govern the conduct of each other with respect thereto; (c) a share in the losses if any; (d) close and even fiduciary relationship between the parties."

10. West's Ann.Cal.Corp.Code § 15006: "A partnership is an association of two or more persons to carry on as co-owners a business for profit." This essential element of joint participation was held also to be a necessary aspect of joint adventure. Spier v. Lang, 4 Cal.2d 711, 716, 53 P.2d 138.

11. See Callahan v. Martin, 3 Cal.2d 110, 43 P.2d 788, 101 A.L.R. 871; La Laguna Ranch Co. v. Dodge, 18 Cal.2d 132, 114 P.2d 351, 135 A.L.R. 546.

12. The interest of Kennedy, created by these documents, must be distinguished from a fractional interest in the profit a prendre itself, i. e., the right to drill for and take petroleum products. Callahan v. Martin, 3 Cal.2d 110, 43 P.2d 788, 101 A.L.R. 871. Likewise, it must be distinguished from a right to a share in the production, as where payment of the royalty may be taken in kind. It might be, at most, a right to share in the proceeds of the oil produced. While this last may be considered in California an interest in real property (See Schiffman v. Richfield Oil Co., 8 Cal.2d 211, 64 P.2d 1081; Chase v. Trimble, 69 Cal.App.2d 44, 158 P.2d 247; Blake, The Oil and Gas Lease, 13 So.Cal.L.Rev. 393, 421), it is most clearly analogous to a simple monetary rent.

13. La Laguna Ranch Co. v. Dodge, 18 Cal.2d 132, 138, 114 P.2d 351, 354, 135 A.L.R. 546.

that the mere creation of such an interest in and of itself constituted a tenancy in common in the profit a prendre has been severely repudiated by the Supreme Court of California.[14] Obviously, the stipulation that the holder of the original permit be paid an overriding royalty stands exactly on the same footing. The mere creation of the interest does not establish him as tenant in common with the operating lessee.

Plaintiff, as he needs must do, recites the fact that the instrument itself contemplated that a continuous payment of royalties was to be made so long as any lease was in operation as a result of the original permit and that the provisions should be construed as "a reservation of the aforesaid overriding royalties and as covenants running with the said lands." Of course, the phrase "running with the said lands" is inaccurate here, since neither party owned the fee, but unquestionably these covenants ran with the existing lease and any extension thereof.[15] Honolulu is bound by them as assignee.

A digression must now be made in order to follow the argument of Kennedy. It is said that, since he has a right running with this lease and any extension thereof to have these payments made by Honolulu, a trust is established. Again, this is a non sequitur. There are certain California cases which hold that the right of the one to whom the royalties are to be paid cannot be cut off by any dealings between the owner and the operating lessee or other persons.[16] It is also held that, if the proceeds come into the hands of a third party with notice, these must be paid to plaintiff.[17] This doctrine was established for the purpose of preventing a defrauding of plaintiffs. In some cases, like results are accomplished by holding the one who acquires the proceeds unlawfully as a trustee ex maleficio[18] or by imposing a constructive trust.[19] But such a remedy does not indicate that a fiduciary relation existed between the parties before the fraudulent acts were committed. In truth, the imposition of a constructive trust is fairly positive proof that no express trust existed theretofore.

But it is unnecessary for this Court to decide whether, if Honolulu repudiated the obligation and paid over to a third party, with notice, funds which plaintiff claimed as overriding royalties, any remedy may be sought or accorded. It is enough to say here that Honolulu has not attempted to repudiate its obligation. No fraud is charged to Honolulu. It is expressly agreed that the share of oil production due Honolulu was sold by the latter in the crude state to other oil companies who purchased the supply. It is also agreed that the prices accepted by Honolulu for such oil products were the

14. "Thus, in so far as Payne v. Callahan, 37 Cal.App.2d 503, 99 P.2d 1050, holds that the fractional interests created either by the lessor or the operating lessee constitute a tenancy in common in a *profit a prendre* as a matter of law, it is expressly disapproved." La Laguna Ranch Co. v. Dodge, 18 Cal.2d 132, 138, 114 P.2d 351, 354, 135 A.L.R. 546.

15. "An agreement to pay an overriding royalty is a covenant that runs with the lease and not with the land. * * * An express provision in the assignment that the override will continue in the event the lease is extended or renewed will preclude termination of the overriding royalty." Sullivan, Handbook of Oil and Gas (1955) § 132.

16. Callahan v. Martin, 3 Cal.2d 110, 43 P. 2d 788, 101 A.L.R. 871. Cf. Austin v. Hallmark Oil Co., 21 Cal.2d 718, 734, 134 P.2d 777.

17. Schiffman v. Richfield Oil Co., 8 Cal.2d 211, 64 P.2d 1081; Dougherty v. California Kettleman Oil Royalties, Inc., 9 Cal.2d 58, 69 P.2d 155; Heaston & Glimpse v. West American Oil Co., 44 Cal.App.2d 107, 111 P.2d 905 (assignment named defendant agent of plaintiff and he was thereby expressly obligated, as trustee, to pay the royalty); Taylor v. Odell, 50 Cal.App.2d 115, 122 P.2d 919.

18. See Differding v. Ballagh, 121 Cal.App. 1, 8 P.2d 201.

19. See also Probst v. Hughes, 143 Okl. 11, 286 P. 875, 69 A.L.R. 929; Oldland v. Gray, 10 Cir., 179 F.2d 408. Compare, Robinson v. Eagle-Picher Lead Co., 132 Kan. 860, 297 P. 697, 75 A.L.R. 840.

prices offered and paid by the oil companies purchasing at the place of production, and that Honolulu accepted the highest prices offered and paid therefor, and that it and its predecessors did not participate in any way in determining what prices would be paid by the purchasing companies for such products. Finally, everyone has agreed that Honolulu and its predecessors in interest accounted to Kennedy at a royalty rate based upon and computed upon the prices received by Honolulu and its predecessors from such oil companies, and the mathematical computation of such payments by Honolulu and its predecessors is correct.

In other words, without collusion or fraud, Honolulu sold the oil products, including its own share, at an established price and paid to Kennedy a percentage portion thereof as set out in the agreement.

Under the circumstances shown in this record, the citations which plaintiff relies upon are inept. The quotation from Summers, on Oil and Gas, § 554, p. 320, appearing in the brief, is inapplicable. This reads:

"But where the assignment of a lease expressly provided that the reservation of an overriding royalty should apply to the extensions, renewals or modifications of the lease that the assignee or his successors might secure, it was held that such a provision created a relation of trust and confidence between the assignor and his assignees permitting the assignor to payment of the overriding royalty reserved in the assignment of oil and gas produced out of the second lease."

Even in the broad manner in which this proposition is stated, there is no possible relevance to the situation here. Honolulu has not repudiated the obligation to make the payments due on account of the production from the "leased" lands.

During the years in question, Honolulu did in fact "pay" the agreed percentage of the amounts for which the oil was sold to other companies. It paid the correct percentage of what it received to Kennedy. If the language of the contract is the guide, Honolulu thus performed its obligation to pay the "equivalent" of the percentage. If a mistake was made, the time for recovery of the difference has passed.[20] Even if it be assumed that a trust relationship existed which prevented Honolulu from repudiating the obligation and refusing to pay Kennedy anything, there is no precedent for extending such a doctrine to require Honolulu to pay more than it actually received as an equivalent for the oil. There is no allegation of bad faith or fraud. Honolulu, as trustee to this extent, would not have been required to pay more than it received even if it did not pay him the highest price it might have got in some other market.

However, the decision is not placed on this ground. The same lease with the United States, as landowner, was still in effect, and the question as to what might have happened in the case of some future "extensions, renewals or modifications of the lease" need not be discussed.

We hold that there was no trust and no fiduciary or confidential relationship here created by this agreement. It was the plain intention of the instrument and each of the parties to create none. Kennedy was obviously attempting to preserve no right of reentry. He stipulated for no share in the profit a prendre. He required no accounting of the profits and losses of the operation. He reserved no power to operate the wells in the event of default of the assignee. He was content with furnishing the opportunity to Kettleman to drill and operate oil wells. In return, Kettleman was to pay him specified equivalents of percentages. Thus he was not burdened with operation or supervision.

On the other hand, Kettleman was not burdened by any supervision or any possibility of reentry or interference with

---

20. See Fowler v. Associated Oil Co., Cal., 74 P.2d 727, 728 (not reported in State Reports; Supreme Court rendered cited opinion and later action was dismissed pursuant to stipulation, 79 P.2d 728).

the profit a prendre by Kennedy. It was a clean-cut deal. It was to pay Kennedy a sum capable of measurement at the times specified.

Great emphasis is laid upon the fact that the covenant was stipulated to run "with the land." Actually, as has been noticed, the covenant ran with the lease and with all extensions, renewals or modifications thereof. In all leases, the covenant to pay rent reserved runs with the lease and can likewise be extended. The main purpose of Kennedy was to assure himself he would not be cut off from his rent by any maneuvers of Kettleman. It seems clear this was the limit of what was intended by the parties here. A continuing relationship was the aim of both parties. Kettleman wished an absolutely free hand in exercising the profit a prendre. Kennedy wanted to be sure of the payment of rent as long as the ground produced oil.

A covenant running with the land is a legal device where it is possible to transfer to strangers to the immediate contract, who have the benefit of occupancy of land, the burden of fulfilling obligations created by the contract itself. It is strictly a device at law. However, the right so created can be protected in chancery.

But, for a breach of a covenant, there is a remedy at common law. This has been denominated from ancient times as an "action on the covenant." It results in the recovery of damages. Covenants running with the land are sometimes called "quasi-easements." But equity will prevent violations thereof, not because of the existence of a trust or confidential relation, but on other grounds. The violation of a true easement can be the basis of a legal action. The result is a judgment for damages.

The parties to these original contracts unquestionably had in mind these principles. It was then their intention to equate this transaction with the ordinary lease or assignment. If they had desired to establish an express trust, there would have been no difficulty for an expert draftsman to have chosen apt language to create such a relationship.[21] At the time, as has been noted above, it is probable that Kennedy did not desire such a clause. But, if Kennedy had wished such a relationship, it must be concluded Kettleman did not agree to it. In any event, all the terms of the contract as written and all the implications which can be drawn from the surrounding circumstances, and, especially, the use of the phrase "covenants running with the said lands," compel us to the conclusion that the only duty Kettleman incurred was the duty to pay to Kennedy the rent.

As there was here no ground for the interference of chancery, any action for insufficient payments during the years in question was necessarily at law. Such an action was barred by both the statutes of limitations above cited. Honolulu was entitled to a summary judgment based upon the allegations of the answer and the stipulated facts.

Reversed.

21.   Compare, Differding v. Ballagh, 121 Cal.App. 1, 8 P.2d 201, where the business trust device was employed.