James I. MOORE, Paul L. Meaders and Lorna P. O'Brien, as tenants in common, Donald K. Lourie, on his own behalf and on behalf of Cynthia Janeway, Edward N. Cogen, George F. Fisher, Jr. and Martha C. Fisher, as tenants in common, Brad Hvolbeck and Marian Hvolbeck, as tenants in common, Donald C. Alexander on his own behalf and on behalf of Hiram D. Black and C. Benson Wigton, Jr., Plaintiffs,

v.

TRISTAR OIL AND GAS CORPORATION, Bryant Oil & Gas Corporation, Sheldon J. Dubow, James B. Lundquist and Clayton Brokerage Co. of St. Louis, Inc., Defendants.

No. 80 Civ. 3383 (JMC).

United States District Court,
S. D. New York.

Nov. 25, 1981.

298

Milton S. Zeiberg, New York City, for plaintiffs.

Cleary, Gottlieb, Steen & Hamilton, New York City (Edwin B. Mishkin and Thomas J. Moloney, New York City, of counsel), for defendants Tristar Oil and Gas Corp., Bryant Petroleum Corp., Sheldon J. Dubow and James B. Lundquist.

Cowan, Liebowitz & Latman, P. C., New York City (Peter R. Porcino, New York City, of counsel), for defendant Clayton Brokerage Co. of St. Louis, Inc.

## OPINION

CANNELLA, District Judge:

After a trial on the merits of plaintiffs' amended complaint, the Court finds for defendants. The amended complaint is dismissed.

The Court reserves decision on defendants' counterclaim [1] pending further proceedings consistent with this Opinion.

## FACTS

*Background*

Plaintiffs bring this diversity action for breach of contract and breach of fiduciary duty against Tristar Oil and Gas Corp. ["Tristar"] and Bryant Petroleum Corp. ["Bryant"],[2] the two former general partners of the Tristar Thermoil Oil Income Program [the "partnership"], a California limited partnership, Sheldon J. Dubow and James B. Lundquist, the presidents, chief executive officers and sole shareholders of Tristar and Bryant respectively, and Clayton Brokerage Co. of St. Louis, Inc. ["Clayton"].[3] Throughout this Opinion, the Court will refer to Tristar, Bryant, Dubow and Lundquist as the Tristar defendants.

Each of the plaintiffs invested in the partnership as limited partners, holding collectively 7–½ of the 40–½ limited partnership units. In brief, plaintiffs allege that the Tristar defendants improperly divided among the limited and general partners the proceeds from (1) the sale of the limited partnership's primary asset, a leasehold interest in certain oil-bearing property in California, and (2) the concurrent sale of interests in the leasehold held by the general partners.[4] Plaintiffs claim that this division of proceeds violated the terms of the limited partnership agreement in that the general partners received a larger portion of the proceeds than that to which they were entitled, thereby decreasing the share of each limited partner. Plaintiffs also charge that defendants breached their fiduciary duties owed to the limited partners, by acting in concert in furtherance of their own interests to the exclusion of plaintiffs' interests.

1. All defendants except Clayton Brokerage Co. of St. Louis, Inc. join in this counterclaim.

2. Bryant is incorrectly named in the amended complaint (filed Oct. 22, 1980) as Bryant Oil & Gas Corporation. As of February 26, 1980, the name of the corporation was changed to Bryant Petroleum Corporation. *See* Plaintiffs' Exhibit 35 [hereinafter Plaintiffs' Exhibits will be referred to as "PX ——," Defendants' Exhibits will be referred to as "DX ——," and Joint Exhibits will be referred to as "JX ——"].

3. Plaintiffs are variously citizens of the States of New York, Florida and Connecticut, and the District of Columbia. *See* Transcript of Trial at 286, 317, 329, 345, 351, 426 (Dec. 12, 15, 16, 17, 1980) [hereinafter "Tr."]; JX 3A–3G. Tristar, Dubow and Lundquist are citizens of California, JX 1 at 28; Tr. at 194, 282, Bryant is a citizen of California and Nevada, JX 1 at 28, and Clayton is a citizen of Missouri, Tr. at 44, JX 1 at i. The Court therefore has jurisdiction pursuant to 28 U.S.C. § 1332.

4. This action was initially brought as a class action seeking to enjoin the closing of the sale, but on June 25, 1980, the Court denied plaintiffs' motion for a preliminary injunction. Plaintiffs thereafter filed an amended complaint, which deleted the class action allegations, joined certain additional plaintiffs, and expressly affirmed the sale of the leasehold interest. Plaintiffs also deleted numerous allegations under the federal securities laws except for alleged violations of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5. On November 6, 1980, the Court denied plaintiffs' motion for partial summary judgment, Fed.R.Civ.P. 56, and on November 24, 1980, the Court granted defendants' motion to dismiss plaintiffs' securities law claims for failure to state a claim upon which relief can be granted, Fed.R.Civ.P. 12(b)(6).

## The Offering Period

The following are the Court's findings of fact: Prior to July 1979, the Thermoil Company ["Thermoil"], a wholly-owned subsidiary of Bryant, held an 80% net leasehold in the property at issue, known as the Kern River field. Bryant thus had the right to explore for and extract oil and gas from the property. The lessor of the property, Tenneco West, Inc. ["Tenneco"], retained a 20% interest in the lease, known as a landowner royalty, which entitled it to 20% of the production and sale of oil and gas. Under the lease, Tenneco could demand its payment either in oil and gas or in money and its interest was not subject to the lessee's production expenses.[5] The lease was to expire in July 1983, although it could be renewed for so long as the lessee determined that oil and gas could be produced in paying quantities.[6] The lease also prohibited the drilling of new oil wells after July 25, 1983.[7] The first wells were drilled on the property in 1964, and by July 1979 forty-nine wells were in place on the property's 110 acres.[8] Over time, however, it had become clear that artificial means of stimulating production were necessary to recover oil in commercial quantities. Bryant decided that a "steam flooding" process would be required to reduce the viscosity of the oil and to increase its flow to the wells. But between December 1977, when Bryant acquired Thermoil, and early 1979, Bryant was unable to raise sufficient funds to engage in a large-scale enhanced recovery program through steam flooding.[9]

To meet its capital requirements, Bryant decided to organize a limited partnership. Its plan was to raise $2 million by arranging in conjunction with Tristar, which was in the business of organizing oil and gas investor participation programs, an offering of fifty units of the limited partnership, at a cost of $40,000 per unit.[10] Bryant and Tristar determined, however, that the operation could commence with as little as $1.2 million although they also determined that the recovery program might be adversely affected if less than $1.7 million was raised.[11] Upon the completion of the offering and the formation of the partnership, Bryant planned to convey its interest in the lease to the partnership[12] for $600,000 in cash and the assumption by the partnership of $186,000 in notes.[13] This amount approximated Bryant's original cost in acquiring the lease through its acquisition of Thermoil as well as the cost of subsequent improvements on the property.[14]

In July 1979, the general partners retained Clayton to act as underwriter on their behalf in the sale of the fifty units. Clayton agreed to use its best efforts to find buyers for the units during a sixty-day offering period in return for 10% of the initial capital raised. The underwriting agreement gave the general partners the sole power to extend the offering period.[15] Because the minimum thirty units had not been sold by September 1979, the general partners extended the offering period.[16]

In October 1979, Lundquist advised Stephen C. Holmes, who was Clayton's syndication manager on this offering, that in Sep-

5. Tr. at 466, 614 16; DX I1, I2, I3; JX 1 at 20.

6. DX I1, art. 3; JX 1 at 20–21.

7. DX I1, art. 5.

8. JX 1 at 1.

9. Tr. at 491; JX 1 at 16.

10. JX 1 at 1.

11. JX 1 at 6-7.

12. Actually, Thermoil planned to assign its interest to its parent Bryant, which would in turn assign it to the partnership. JX 1 at 20.

13. Tr. at 125 26; JX 1 at 20, 30. One of the notes, in the amount of $52,000, was payable to Dr. Clarke Simm, a petroleum consultant to the partnership and the owner of the lease from 1963 to 1977. Tr. at 465–67, 486–87; JX 1 at 30. When he sold the lease to Bryant, Simm retained an approximate 35% interest in the net profits from Bryant's investment. Tr. 467 · 68; JX 1 at 30-31.

14. JX 1 at 20.

15. Tr. at 44–45; JX 1 at 2.

16. Tr. at 45.

tember the Getty Oil Corporation had offered $1.8 million to purchase Bryant's interest in the Kern River lease and that in October Santa Fe Industries, Inc. had offered $3.5 million toward the same end.[17] After consulting his superiors at Clayton, Holmes asked Lundquist if the general partners would give Clayton another extension and refrain from selling the property. The general partners decided not to exercise their right to withdraw from the offering and granted the requested extension.[18] By mid-November, Clayton had achieved the minimum capitalization,[19] and by late-November, 40–½ units had been sold to thirty-one persons for a total sum of $1,620,000.[20]

The limited partnership offering was made through the use of a Private Placement Memorandum [the "Memorandum"].[21] Each investor, including plaintiffs, signed a subscription agreement certifying that he had read the Memorandum and the Certificate and Agreement of Limited Partnership [the "Partnership Agreement"],[22] and, in making his investment, had relied on the information contained therein.[23] By signing the subscription agreement, each investor also agreed to be bound by the terms of the Partnership Agreement.[24] During the offering, Clayton undertook to ascertain whether each subscriber met the offering criteria, namely, that the subscriber was a wealthy and sophisticated investor and capable of bearing the economic risks of an investment in the limited partnership. All of the plaintiffs met the offering criteria.[25]

The Memorandum is a fifty-one page document, plus appendices, and contains a detailed description of the limited partnership,

its purpose and goals, and the rights and obligations of the general and limited partners. The Memorandum also contains a copy of the Partnership Agreement. The Memorandum and Partnership Agreement state that upon formation of the partnership the general partners would receive a one-time fee of 5% of the initial capital to cover their expenses in organizing the partnership.[26] These documents also reveal that as compensation for organizing and promoting the limited partnership, the general partners would receive 1% of the partnership's net income.[27] The general partners would also receive an annual overhead reimbursement fee of $20,000,[28] and, upon dissolution, 10% of the distributable assets of the partnership.[29]

Of particular import to this litigation are the Memorandum and Partnership Agreement's provisions relating to the general partners' so-called "overriding royalty" and "working interest." Both documents explain that the general partners would receive, as consideration for managing the partnership, a 5% overriding royalty in the revenues from the property until the limited partners recovered 100% of their initial capital contributions at "payout," and, after payout, a 10% overriding royalty and a 10% working interest in all the limited partnership's property.[30] Thus, as explained in the Memorandum, after Bryant conveyed its interest in the lease to the partnership, the partnership would hold a 100% working interest in a 75% net leasehold, Tenneco would retain its 20% net leasehold by virtue of its landowner royalty, and the general partners would own a 5% net leasehold by

---

17. Tr. at 46–47, 477.

18. Tr. at 47–50.

19. Tr. at 45.

20. Tr. at 197; JX 3A–3G.

21. Tr. at 196; JX 1.

22. JX 2. The Partnership Agreement is attached to the Memorandum as Exhibit A.

23. JX 3A–3G. The subscription agreement is attached to the Memorandum as Exhibit E.

24. *Id.* at 3.

25. Tr. at 106–07, 275–76; JX 3A–3G.

26. JX 1 at 3, 26; JX 2, § 7.01(a).

27. JX 1 at 3, 27; JX 2, § 7.01(b).

28. JX 1 at 3, 27; JX 2, § 7.01(e).

29. JX 1 at 3, 27; JX 2, § 12.03(c).

30. JX 1 at 3, 20, 26–27, 31; JX 2, § 7.01(c), (d).

virtue of their 5% overriding royalty.[31] After payout, the partnership would hold a 90% working interest in a 70% net leasehold, Tenneco would continue to hold its 20% landowner royalty, and the general partners would hold a 10% net leasehold through their stepped-up overriding royalty, as well as a 10% working interest in the partnership's 70% net leasehold.[32]

An overriding royalty is defined in the Partnership Agreement as "an interest in the oil and gas produced pursuant to a specified oil and gas lease or leases, or the proceeds from the sale thereof, carved out of the working interest, to be received free and clear of all costs of development, operation, or maintenance."[33] The Memorandum defines overriding royalty as "[a]n interest in oil and gas produced free of the expenses of production, and which is in addition to the royalty reserved by the lessor of the land."[34] The term working interest is defined in the Partnership Agreement as "an interest in an oil and gas leasehold which is subject to some portion of the expense of development, operation, or maintenance."[35] In the Memorandum, a working interest is defined as

[a]n operating interest under an oil lease covering a specific tract or tracts of land. The owner of a working interest has the right to explore for, drill and produce the oil covered by such lease, and to bear a proportionate share of the expense of development, operation or maintenance. In the situation of a lessor who executes a lease, reserving a 20% royalty, to a lessee who creates no additional burdens on such lease, the working interest receives

80% of production therefrom subject to all costs of exploration, operation and development and the lessor receives its 20% of production free of such costs.[36]

The Memorandum states that the partnership would assign to the general partners their overriding royalty,[37] and it is a customary practice in the oil and gas industry to assign both overriding royalty interests and working interests.[38] These terms will be discussed more fully below.

In a document entitled "Schedules of Projected Program Cash Flow, Projected Cash Flow From Operations and Projected Taxable Income/(Loss)" ["Schedules"], attached as part of an appendix to the Memorandum,[39] the partnership's independent accounting firm, Elmer Fox, Westheimer & Co. ["Fox"], calculated the prospective economic consequences of the various interests. Using figures supplied by the general partners concerning the estimated amount of recoverable oil on the lease property and its estimated selling price per barrel,[40] Fox projected that over the fifteen-year expected life of the limited partnership, the property would generate gross sales of $35,802,000.[41] Of this amount, $7,160,400, or 20%, would be paid to Tenneco as its landowner royalty, and $3,085,200 would be paid to the general partners as an overriding royalty, taking into consideration the step-up from 5% to 10% at payout.[42] The remaining $25,556,400 would be paid to the working interests.[43] Of the latter amount, the partnership would receive $23,728,264, representing a 100% working interest before payout and a 90% working interest after payout, and

31. JX 1 at 1, 20, 26 -27.

32. *Id.* at 3, 20, 26 27.

33. JX 2, § 13.11(g).

34. JX 1 at 11.

35. JX 2, § 13.11(*I*).

36. JX 1 at 12.

37. *Id.* at 20.

38. Tr. at 210 11, 464–65, 617 18, 627.

39. JX 1, Appendix.

40. JX 1 at 5–6, 18 -19. Fox's cash flow projections were based on a report dated April 16, 1979, submitted by Evans & Carey, Inc., a petroleum engineering firm retained by the general partners, in which the potentially recoverable oil was estimated. *See* JX 1, Appendix (Evans & Carey, Inc. letter dated Apr. 16, 1979).

41. JX 1, Appendix at 11.

42. *Id.*

43. *Id.*

the general partners would receive $1,828,-136, representing a 10% working interest after payout.[44] After subtracting each party's share of expenses, the partnership would have net income of $6,439,464,[45] and the general partners would have net income of $518,000.[46] Of the partnership's net income, the general partners would receive $64,395, or 1%, and the limited partners would receive $6,375,069, or 99%.[47]

In sum, according to the projections in the Schedules, over the life of the program the general partners would receive $3,667,-595 and the limited partners would receive $6,375,069. Thus, the general partners would receive 36.5% of the net revenues and the limited partners would receive 63.5% of the net revenues.

On November 29, 1979, Dennis G. Strauch, a reservoir engineer associated with the Petro-Lewis Corporation ["PLC"], telephoned Stephen K. Burch, a Clayton employee, to express PLC's interest in acquiring the Kern River lease.[48] In a confirmation letter of that date, Strauch stated that "the preliminary value of this property appears to be in the neighborhood of $12 to $15 million," although he noted that PLC would not make a formal offer until a thorough petroleum engineering evaluation had been completed.[49] Strauch explained that PLC had become interested in the Kern River lease because it was also considering acquiring an adjacent oil field and believed that it was commercially advantageous to acquire the two properties together. Burch and Stephen Anthony, a Clayton vice-president, advised Holmes of this development on November 30.[50] The same day, Clayton

likewise informed Dubow and Lundquist, but did not identify PLC as the interested party.[51] Clayton also halted all sales of limited partnership units at that time.[52]

On December 4, 1979, Clayton sent a Mailgram to the subscribers advising them that (1) the price of crude oil had nearly doubled since the date of the Memorandum, which would have the effect of substantially increasing the partnership's projected revenues and expenses, although the additional revenues were expected to far exceed the additional expenses; (2) the State of California had proposed stringent new air quality regulations that might delay the implementation of the partnership's enhanced recovery program by forcing alterations of the two steam generators contemplated for the Kern River field; (3) Clayton had received a letter from a party interested in purchasing the lease; and (4) the closing of the sale of limited partnership units was scheduled for December 10, 1979.[53] In the Mailgram, Clayton asked each investor to notify Clayton by December 7 if he wished to rescind his subscription in light of the reported developments. None of the investors withdrew from the program.[54]

On December 10, 1979, the sale of the limited partnership units closed and the partnership was formed.[55] Also on that date, certain assignments were made. First, Thermoil assigned its interests in the lease to Bryant[56] and Bryant in turn assigned its interests to the partnership in exchange for $786,000.[57] The partnership then assigned to the general partners the latter's overriding royalty and working in-

---

44. *Id.* at 12.

45. *Id.* at 5.

46. *Id.* at 11.

47. *Id.* at 4–5.

48. Tr. at 51–52.

49. JX 6.

50. Tr. at 51.

51. Tr. at 56, 83.

52. Tr. at 52–53, 160–61.

53. Tr. at 70–74, 225–26; PX 19.

54. Tr. at 74.

55. Tr. at 73–74, 83.

56. JX 13E.

57. JX 13F.

terest.[58] Finally, each of these assignments were recorded in the office of the Kern County Recorder.[59]

During the offering period, and prior to the formation of the limited partnership, Bryant incurred expenses totalling $75,963 for maintenance and rehabilitation of the leasehold property.[60] In February 1980, after the partnership was formed, the partnership reimbursed Bryant for this amount[61] because, based on what they had been told by Clayton, the general partners believed that such pre-formation expenses were reimbursable.[62] During a routine audit conducted by Fox for the first quarter of 1980, however, Fox discovered that the Memorandum did not provide for the reimbursement of such expenses and so informed the general partners.[63] The general partners then advised the limited partners of these facts and, on July 17, 1980, the general partners repaid the partnership in full for the $75,963 paid to Bryant.[64]

*The Sale to PLC*

On December 10, after the partnership closed, Clayton informed the general partners that PLC was the party interested in purchasing the lease.[65] PLC had made it clear to Clayton that it intended to acquire all the various interests in the lease, with the exception of Tenneco's landowner royalty, and did not wish to have any such interests continue as burdens on the lease after the sale.[66]

A few days earlier, and prior to Clayton's identifying PLC as the prospective purchaser, Holmes and Dubow had first discussed the valuation of the general partners' overriding royalty and working interests, anticipating that the buyer would want to acquire those interests as well as the partnership's interests. Dubow first suggested that if the general partners sold their interests along with the partnership's interests, they should receive one-third of the total proceeds. Holmes responded initially that the general partners' interests would be worth 20%, but, after reviewing the Schedules and determining that the general partners could realize 36.5% of the projected net revenues over the life of the partnership, he agreed with Dubow that one-third was a more appropriate valuation.[67] Holmes nevertheless insisted that the fairness of such an allocation would have to be confirmed by independent accountants who would make revised projections if an agreement to sell was reached.[68]

Immediately after the partnership closed on December 10, negotiations with PLC commenced. At the first meeting, attended by Holmes, Burch, Lundquist, Dubow, Simm, counsel to the partnership, and representatives of PLC, PLC asked for data to assist its own geologists in their evaluation of the property.[69] PLC then took until late January 1980 to complete its evaluation.

In the meantime, the general partners decided to retain Clayton as exclusive agent for the general partners and the partnership to assist in the negotiations with PLC and in the evaluation of any offer re-

58. JX 13G.

59. JX 13E, 13F, 13G. Under the terms of the lease, Tenneco, the landowner, was required to consent to these assignments, Tr. at 497; DX II, art. 20, which it did on December 7, 1980, Tr. at 562 ·63; DX O. At Clayton's request, a "Waiver of Default" was also obtained by the general partners from Tenneco in connection with the closing of the partnership, PX 35; DX O, although Simm and Lundquist believed that Bryant was not in default on its obligations under the lease, Tr. at 500 02. Whether or not Bryant was in default is not an issue in the instant action.

60. Tr. at 214 17, 268 74, 580 82.

61. PX 21.

62. Tr. at 269 72.

63. PX 25 at 10.

64. Tr. at 273 74; PX 22.

65. Tr. at 56, 83.

66. Tr. at 150; JX 7.

67. Tr. at 57 59, 156 59.

68. Tr. at 77, 129.

69. Tr. at 149.

ceived.[70] In late December, Holmes, Dubow and Lundquist discussed the commission that Clayton would receive for its services.[71] Clayton consulted with Dean Witter Reynolds, Inc. and with its own counsel to determine if there was a standard fee for negotiating this type of transaction.[72] Advised that there was none, Holmes decided to request 5% of the total purchase price and so informed Dubow, although he knew that a lesser fee was not inappropriate.[73] The next day, Dubow telephoned Holmes and asked if Clayton would accept less than 5%. Holmes said it would not and Dubow then agreed to the 5% request.[74] Holmes then asked for an additional 1% to be paid to Burch as a separate finder's fee, but Dubow refused.[75]

On January 11, 1980, a formal memorandum of agreement was entered into between Clayton and the general partners and between Clayton and the partnership. The parties agreed that payment of the 5% fee would be allocated between the general and limited partners in proportion to the projected amount each group would receive from the sale, or approximately one-third by the general partners and two-thirds by the limited partners. Clayton agreed to bear all of the expenses it incurred in negotiating the sale.[76]

On January 30, 1980, PLC submitted a formal offer to purchase 100% of the general and limited partners' interests in the lease, as well as all operational materials and equipment, for $7 million in cash. The offer stated that PLC sought a 100% working interest in an 80% net leasehold, which excluded Tenneco's continuing 20% landowner royalty.[77] PLC had reduced its offer to $7 million from the $12–$15 million expression of interest in November 1979[78] because of the intervening passage by Congress of the "windfall profits" tax.[79]

In February 1980, Clayton and the general partners met with PLC representatives on several occasions in an attempt to persuade PLC to raise its offer.[80] As a result, in a letter dated February 20, 1980, PLC submitted a revised offer of $8 million.[81] A few days later, the parties held another meeting at which PLC agreed to increase its offer to $8.5 million. The February 20th letter was accordingly altered by hand on February 26, 1980 and signed by the parties as a letter of intent.[82]

In March 1980, at Clayton's request, Fox prepared revised projections of the cash distributable from the partnership's operations over the expected life of the program.[83] After reviewing these projections, Clayton realized that if the general partners received one-third of the sales proceeds for their overriding royalty and working interests as well as 10% of the distributable

**70.** Tr. at 61, 202–04, 218.

**71.** Tr. at 59–61.

**72.** Tr. at 167, 192.

**73.** Tr. at 113, 115, 167, 191–93.

**74.** Tr. at 60–61, 113–15, 162.

**75.** Tr. at 162.

**76.** Tr. at 61, 81, 168; JX 4. Clayton also agreed to pay 45% of the fee it received to Burch, as compensation for Burch's services as a finder. Tr. at 168–69; JX 5.

**77.** Tr. at 150; JX 7.

**78.** JX 6.

**79.** Tr. at 139. The windfall profits tax is contained in the Crude Oil Windfall Profit Tax Act of 1980, Pub.L.No.96–223, 94 Stat. 229 (1980). The bill providing for the tax was not passed by both houses of Congress until December 17, 1979, when the Senate approved an amended version of H.R. 3919, 96th Cong., 2d Sess. (1979), U.S.Code Cong. & Admin.News 1980, p. 410, see 125 Cong.Rec. S18,863 (daily ed. Dec. 17, 1979), which was subsequent to the initial negotiations with PLC but prior to PLC's submission of its formal offer. The tax was actually enacted on April 2, 1980, when President Carter signed the bill into law, after the House of Representatives and the Senate had agreed to a conference committee report on the bill. *See* 126 Cong.Rec. H1861 (daily ed. Mar. 13, 1980); *id.* at S3151 (daily ed. Mar. 27, 1980).

**80.** Tr. at 151–53.

**81.** Tr. at 153–54; JX 8.

**82.** Tr. at 154.

**83.** Tr. at 573.

assets of the partnership upon dissolution, they would receive approximately 40% of the sales proceeds.[84] Clayton informed the general partners of this fact. The general partners accordingly agreed to reduce the amount they would receive for their overriding royalty and working interests to 28% of the total proceeds of the sale so that when combined with their share of the partnership assets upon dissolution—that is, after PLC had fully paid the purchase price—their share of the sales proceeds would be approximately one-third.[85]

Fox's revised projections also showed that over the life of the program the general partners would receive between 27% and 52% of the cash distributable from operations for their overriding royalty and working interests, depending on whether crude oil produced from the property could be used to power the partnership's steam generators.[86] Recently-enacted state environmental regulations had raised the possibility that the on-site crude, with its relatively high sulphur content, could not be used. If so, the partnership would have to purchase crude oil from outside sources, which, in light of rapidly increasing crude oil prices, would substantially increase the partnership's expenses. And since the general partners' overriding royalty was payable irrespective of the expenses of production, the general partners would thereby receive a greater proportionate share of oil revenues.[87] Fox determined, however, that some combination of purchased and on-site crude would likely be utilized.[88] After reviewing the revised projections, Clayton decided to endorse the proposed allocation of proceeds as being fair and reasonable to the limited partners, because, in its opinion, it was likely that the general partners would receive at least one-third of the oil revenues if the partnership continued its operations.[89]

In April 1980, PLC again reduced its offer, this time to $6.5 million, after learning that Tenneco, as lessor, would discontinue its policy of contributing to the cost of fuel oil used in the steam generators.[90] Holmes, who had devoted 50% of his time to the PLC transaction between December and April,[91] managed to persuade PLC to return to the $8.5 million offer by explaining that PLC might be able to use some of the on-site crude oil to power the generators.[92] On April 24, a formal purchase agreement was executed by the parties, which allocated $6,120,000—or 72%—of the purchase price to the partnership for its working interest, and $2,380,000—or 28%—to the general partners for their overriding royalty and working interests.[93] The purchase agreement further provided that payment would be made in installments: 28% to be paid at closing in cash with the remainder embodied in two promissory notes, guaranteed by PLC and carrying a 16% rate of interest, due on January 2, 1981.[94] This arrangement was recommended by Holmes as a means of spreading the limited partners' taxable gain over two years and to allow them time to undertake any appropriate financial planning.[95]

*Approval of the Sale*

As set forth in the Partnership Agreement, the general partners had the power and authority "[t]o sell, dispose, trade or exchange all or any portion of Limited Partnership property upon such terms and conditions and for such consideration as the General Partners deem appropriate with the consent of the Limited Partners holding a combined Sharing Ratio of 60% or

**84.** Tr. at 174–75, 221–22.

**85.** Tr. at 174–75, 221–22.

**86.** Tr. at 129–30, 574–77; JX 11 & Appendix A.

**87.** Tr. at 131, 574–76.

**88.** Tr. at 577.

**89.** Tr. at 128–30; JX 12.

**90.** Tr. at 155.

**91.** Tr. at 167-70.

**92.** Tr. at 155.

**93.** Tr. at 155–56; JX 9.

**94.** JX 9, ¶ 9(c).

**95.** Tr. at 170–71.

more." [96] Accordingly, after the purchase agreement was signed, the general partners, with Clayton's assistance, prepared proxy materials for a meeting of the limited partners to be held on June 23, 1980 in St. Louis, at which the limited partners were to be given the opportunity to approve or disapprove the sale.[97]

The proxy materials described the proposed sale to PLC, setting forth the sales price and proposed distribution of proceeds.[98] The materials also brought the limited partners up-to-date on the partnership's revised capitalization requirements if the partnership were to continue,[99] and included a letter from Fox containing its revised projections and a comparative analysis of the net revenues projected to flow to the general partners and limited partners under the original and revised projections.[100] The proxy materials also included an opinion letter from Clayton, which Holmes had suggested in April that Clayton prepare,[101] stating that the transaction was fair and equitable to the limited partners.[102] The limited partners were asked to vote either in person or by proxy for or against the sale of the partnership's interest in the lease in accordance with the terms of the purchase agreement and, in the event the sale was approved, for or against the dissolution of the partnership in accordance with Article XII of the Partnership Agreement.[103] The proxy materials were mailed May 22, 1980.

The meeting was held as scheduled on June 23, 1980 and all the limited partners who attended had a fair opportunity to express their views.[104] Some limited partners expressed dissatisfaction with the proposed division of sales proceeds as not being in accord with the Memorandum and Partnership Agreement. They also argued that Clayton's 5% commission was excessive and that the tax aspects of the transaction could be more favorably structured toward the limited partners.[105] Nevertheless, 31-½ of the limited partnership units were voted in favor of the sale and dissolution, 4-½ were voted against, one unit abstained and four did not submit proxies.[106] Because more than 60% of the limited partnership units were voted in favor, the sale and dissolution were approved. On June 30, 1980, after the Court had denied plaintiffs' motion for a preliminary injunction, the sale to PLC was consummated.[107] As a result, each limited partner has received a full return of his initial capital contribution plus approximately $100,000 per unit, which represents a 250% return on each unit's cost of $40,000.[108]

## DISCUSSION

### Breach of Contract Claim

Plaintiffs' principal claim can be summarized as follows: Under the Partnership Agreement, the general partners were entitled to compensation solely as consideration for managing the partnership; that is, for their services performed in connection with

96. JX 2, § 9.02(f). "Sharing ratio" is defined as follows:
    [W]ith respect to the General Partners, 1% of all costs and revenues of the Limited Partnership. With respect to the Limited Partners, it means 99% of all costs and revenues of the Limited Partnership. The Sharing Ratio of the individual Limited Partners with respect to each other will be in proportion to their Initial Capital contributions. Such Sharing Ratios will be subject to adjustment if the Limited Partner fails to respond to an assessment.
    *Id.,* § 13.11(j).

97. Tr. at 137, 170; JX 11.

98. JX 11 at 1–3, 7–9.

99. JX 11 at 5.

100. JX 11, Appendix A.

101. Tr. at 159–60.

102. Tr. at 157–59, 169–70; JX 11, Appendix B; JX 12.

103. JX 11 at 12–13.

104. Tr. at 294.

105. Tr. at 291–93.

106. Tr. at 583.

107. Tr. at 583.

108. Tr. at 583–84.

the production and sale of oil and gas. Thus, plaintiffs contend that prior to such production and sale the general partners were not entitled to claim either an interest in the leasehold separate and apart from the partnership property—the overriding royalty—or a working interest in the partnership property separate from the partnership's working interest in the partnership property. Because the evidence established that up until the time of the sale to PLC there had been no significant production,[109] plaintiffs reason that the general partners simply did not own any overriding royalty or working interest which they were entitled to sell. Thus, plaintiffs claim, the $8.5 million purchase price should have been allocated entirely to the purchase of the partnership's assets—principally an 80% net leasehold in the Kern River lease.

If the purchase price had been allocated in the manner suggested by plaintiffs, the partnership would have held $8.5 million in assets to distribute upon dissolution pursuant to section 12.03 of the Partnership Agreement.[110] Section 12.03 provides that after paying the debts of the limited partnership, the assets would be used first to pay back 100% of each limited partner's initial capital contribution. Ten percent of any balance would thereafter be distributed to the general partners and 90% would be distributed to the limited partners. In short, plaintiffs claim that of the $8.5 million, $1.62 million, representing the limited partners' initial capital contributions, should first have been distributed to the limited partners, and that 90% of the remaining $6.88 million, or $6.192 million, should thereafter have been distributed to the limited partners, leaving 10% of $6.88 million, or just $688,000, for distribution to the general partners.

■ The question presented then is whether pursuant to the Partnership Agreement the general partners owned, prior to the production of oil and gas, an independently assignable, recordable and salable overriding royalty and working interest.[111] Initially, the Court notes that the definitions given these terms in the Memorandum and Partnership Agreement are consistent both with their meaning under California law, which governs the issues in this case pursuant to section 13.04 of the Partnership Agreement, as well as with their commonly understood meaning in the petroleum industry. *See Energy Oils, Inc. v. Montana Power Co.*, 626 F.2d 731, 733 nn. 2&3 (9th Cir. 1980); *Cox v. United States*, 497 F.2d 348, 350 nn. 1&2 (4th Cir.), *cert. denied*, 419 U.S. 1047, 95 S.Ct. 621, 42

**109.** Between December 10, 1979 and June 30, 1980, the partnership produced only 500–600 barrels of oil out of a potential recovery of approximately 3.2 million barrels. Tr. at 480.

**110.** JX 2, § 12.03(c).

**111.** Defendants initially argue that plaintiffs cannot challenge the terms of the sale to PLC because more than 60% of the partnership units were voted in favor of the sale and consequent dissolution, in accordance with § 9.02(f) of the Partnership Agreement. The Court disagrees. Although § 9.02(f) gives the general partners the authority to sell partnership property, no provision of the Partnership Agreement gives the general partners the authority to decide what constitutes partnership property. Section 15018(h) of the California Uniform Partnership Act, Cal.Corp.Code § 15018(h) (West 1977), which is apparently applicable to limited partnerships pursuant to Cal.Corp.Code § 15509(1) (West 1977), provides that "no act in contravention of any agreement between the partners may be done rightfully without the consent of all the partners." Thus, if the general partners unilaterally decided, in contravention of the Partnership Agreement, that certain property was not partnership property but rather belonged to them, the sale to PLC would have been improper unless 100% of the partnership units were voted in favor. Indeed, the limited partners were never asked to ratify a decision outside the scope of the general partners' authority. Therefore, the real issue is whether the general partners were correct in their understanding of what property belonged to them and what property belonged to the limited partnership. If the general partners did not in fact own the separate interests they claimed to own, then the partnership is entitled to the entire $8.5 million sales proceeds, regardless of the June 23, 1980 vote. As set forth below, however, the Court believes that the general partners did not act in contravention of the Partnership Agreement, and that the general partners' understanding of who owned what and when they owned it was correct and in accordance with the Partnership Agreement.

L.Ed.2d 641 (1974); *United States v. Thomas*, 329 F.2d 119, 130 n.1 (9th Cir.), *cert. denied*, 379 U.S. 819, 85 S.Ct. 39, 13 L.Ed.2d 31 (1964); *Meeker v. Ambassador Oil Co.*, 308 F.2d 875, 882 (10th Cir. 1962), *rev'd on other grounds*, 375 U.S. 160, 84 S.Ct. 273, 11 L.Ed.2d 261 (1963); *Texaco, Inc. v. Pigott*, 235 F.Supp. 458, 464 (S.D.Miss.1964), *aff'd mem.*, 358 F.2d 723 (5th Cir. 1966); *La Laguna Ranch Co. v. Dodge*, 18 Cal.2d 132, 135, 114 P.2d 351, 353 (1941); *Payne v. Callahan*, 37 Cal.App.2d 503, 511, 99 P.2d 1050, 1056 (1940); *Hagood v. Heckers*, 182 Colo. 337, 347, 513 P.2d 208, 214 (1973); *Cities Service Oil Co. v. Pubco Petroleum Corp.*, 497 P.2d 1368, 1372 (Wyo.1972); H. Williams & C. Meyers, *Oil and Gas Terms* 410–11, 655 (1980) ["*Oil & Gas Terms*"]; 2 H. Williams & C. Meyers, *Oil and Gas Law* ¶¶ 418, 418.1 (1981) ["*Oil & Gas Law*"]. Moreover, these definitions are consistent with the definitions given by both expert witnesses asked to define these terms at trial.[112]

■ Second, under California law, both an overriding royalty and a working interest are interests in real property that can be assigned or sold separately from or together with other interests in an oil and gas lease. *See Schiffman v. Richfield Oil Co.*, 8 Cal.2d 211, 227, 64 P.2d 1081, 1088–89 (1937); *Hausen v. Goldman*, 124 Cal.App.2d 25, 29, 267 P.2d 852, 854–55 (1954); *Taylor v. Odell*, 50 Cal.App.2d 115, 121, 122 P.2d 919, 923–24 (1942); *Phillips v. Bruce*, 41 Cal.App.2d 404, 407, 106 P.2d 922, 924 (1940); *Payne v. Callahan, supra*, 37 Cal.App.2d at 516, 99 P.2d at 1056; 3A W. Summers, *The Law of Oil and Gas* § 598, at 197 (perm. ed. 1958) ["Summers"]. For example, the working interest owner, who is exclusively entitled to exploit the minerals on the land, may transfer out of his working interest an overriding royalty, and still retain the exclusive right to operate the premises. *See Western Oil & Refining Co. v. Venago Oil Corp.*, 218 Cal. 733, 737, 24 P.2d 971, 973 (1933); *Arkansas Fuel Oil Co. v. Gary*, 227 La. 524, 533, 79 So.2d 869, 872 (1955); *Oil and Gas Terms, supra*, at 655; *Oil & Gas Law, supra*, § 418. The working interest itself can then be sold without affecting either the continuing discrete and independent value of the overriding royalty, *see Taylor v. Odell, supra*, 50 Cal.App.2d at 122, 122 P.2d at 923–24; *Oil & Gas Law, supra*, § 418.2, or the overriding royalty owner's entitlement to the agreed-upon share of production out of the working interest, *see Western Oil & Refining Co. v. Venago Oil Corp., supra*, 218 Cal. at 737, 24 P.2d at 973. Indeed, only the termination or extinguishment of the lease to which the overriding royalty relates will terminate the override, because the royalty has been "carved out" of the working interest owned by the lessee and if the lease terminates so must the working interest. *See La Laguna Ranch Co. v. Dodge, supra*, 18 Cal.2d at 140, 114 P.2d at 355. The working interest owner can likewise transfer a portion of the working interest, creating a tenancy-in-common in the working interest. *See id.* at 136, 114 P.2d at 354; *Oil & Gas Law, supra*, § 404.

■ Moreover, as interests in real property, overriding royalties and working interests can be recorded. *See La Laguna Ranch Co. v. Dodge, supra*, 18 Cal.2d at 140, 114 P.2d at 355; *Dabney-Johnston Oil Corp. v. Walden*, 4 Cal.2d 637, 647, 52 P.2d 237, 241–42 (1935); *Callahan v. Martin*, 3 Cal.2d 110, 113, 43 P.2d 788, 797 (1935); *Recovery Oil Co. v. Van Acker*, 96 Cal.App.2d 909, 910, 216 P.2d 483, 484 (1950); *Dame v. Mileski*, 80 Wyo. 156, 170, 340 P.2d 205, 207 (1959); 3 Summers, *supra*, § 556, at 679 n.4.4, 686. Indeed, "[i]f the transfer is left unrecorded, the transferee's interest is subject to being defeated by a subsequent purchaser from the transferor." *Oil & Gas Law, supra*, § 439.1, at 526.

■ The above discussion leaves only the issue of whether the general partners owned an overriding royalty and working interest, to the extent claimed by them, prior to the production of oil and gas. Plaintiffs are correct that this question turns primarily on an interpretation of the relevant contract—the Partnership Agree-

---

112. Tr. at 463 (Simm), 613–16 (Harold Pruner).

ment—because it was pursuant to the Partnership Agreement that the general partners caused these interests to be assigned to themselves from the partnership. Expert testimony was admissible for the purpose of explaining the meaning of the technical contract terms, *see Arkla Exploration Co. v. Boren,* 411 F.2d 879, 882 (8th Cir. 1969); *Phillips Petroleum Co. v. Payne Oil Corp.,* 146 F.2d 546, 547 (10th Cir. 1944), since that testimony did not vary or contradict those terms.

▇▇▇ Section 7.01 of the Partnership Agreement provides, in pertinent part:

(c) Until the Limited Partners have received a 100% return of their Initial Capital contributions at Payout, the General Partners, as consideration for managing the Partnership, shall be entitled to a 5% overriding royalty interest in all oil and gas produced by the Limited Partnership and the proceeds from the sale thereof.

(d) After the Limited Partners have received a 100% return of their Initial Capital contributions at Payout, the General Partners, as consideration for managing the Partnership, shall be entitled to a 10% overriding royalty in all oil and gas produced by the Partnership and the proceeds from the sale thereof and a 10% working interest in all the Limited Partnership's property.

As the Court interprets these provisions, the overriding royalty and working interests constituted the general partners' compensation for "managing" the partnership. The first question presented then is what constituted management of the partnership. Section 9.01 of the Partnership Agreement provides that the general partners "shall have full and exclusive control and discretion in the management of the [partnership's] affairs." Section 9.02 further provides, in pertinent part:

In connection with such management and control, the General Partners shall have the power and authority to do or cause to be done any and all acts deemed by the General Partners to be necessary or appropriate thereto, including, without limitation, the power and authority:

. . . .

(f) To sell, dispose, trade or exchange all or any portion of Limited Partnership property upon such terms and conditions and for such consideration as the General Partners deem appropriate with consent of the Limited Partners holding a combined Sharing Ratio of 60% or more.

In light of the above provisions, the Court finds that the negotiation and sale of the partnership's property to PLC was an aspect of management for which express provision was made in the Partnership Agreement. Thus, the Court rejects plaintiffs' claim that the "consideration" mentioned in section 7.01 referred solely to services performed in connection with the production and sale of oil and gas. This conclusion comports with common sense—certainly management of a partnership's affairs includes the ability to sell the partnership's assets if an opportunity advantageous to the partnership arises.

The second question presented by these contractual provisions concerns the language in subsections 7.01(c) and (d) of the Partnership Agreement, which gives the general partners an overriding royalty "in all oil and gas produced by the [partnership] and the proceeds from the sale thereof." Plaintiffs in effect argue that because there was no significant production and sale of oil and gas, the general partners could have acquired an overriding royalty only by breaching the Partnership Agreement. The Court disagrees.

At trial, an expert witness produced by plaintiffs and an expert witness produced by defendants were each asked the following question:

[I]n the custom and usage or practice in the oil and gas industry, does the term "overriding royalty interest" refer solely to an interest in revenues from the production and sale of oil or does it also include an interest in the revenue from the sale of the property prior to any significant production and sale of oil?

Defendants' expert answered:

The answer is that, yes, it includes both . . . [b]ecause . . . in effect the dollars

that are received are for the same item. If I produce the oil and gas, I distribute revenue on a monthly basis as I receive it from the purchaser. If I sell what we have been referring to as the interest, the interest was obtained through an oil and gas lease and, therefore, is only the oil and gas in the ground and, as a consequence, the sales proceeds are in effect for unproduced oil reserves.

So that those dollars are, if you will, advance payments for oil and gas reserves and, therefore, accrue to the interest owners of those reserves.[113]

Plaintiffs' expert was asked to answer the same question in the context of the Memorandum and Partnership Agreement, with which he professed familiarity. He responded:

I would say yes, it also does, in both cases. If I may explain the basis for that conclusion, it is that an interest in production is of value. It is an entity, it is an equity. And if this entity is sold, it is valuable, then yes, the overriding royalty interest would follow in a sale, would participate in a sale.

It can be separate or it can be combined with other interests.[114]

The import of this testimony is clear; an overriding royalty is by nature an interest in production, with an independent value. If sold, the sales proceeds can be considered advance payments for the oil and gas to be produced at some later time. Therefore, since the Partnership Agreement referred to an overriding royalty in the proceeds from the sale of oil and gas, the general partners could indeed have acquired an overriding royalty pursuant to the Partnership Agreement prior to the actual production of oil and gas.

Finally, the 10% working interest to which section 7.01(d) refers is not connected to the production of oil and gas but is simply to be received by the general partners at payout. Thus, there can be no claim that this interest could exist only if there was actual production of oil and gas.

In light of the foregoing discussion, the Court concludes that, pursuant to the Partnership Agreement, the general partners owned, prior to the production of oil and gas, an independently assignable, recordable and salable overriding royalty and working interest. Although the Partnership Agreement provides that the working interest and the stepped-up overriding royalty would not produce income to the general partners until payout, as soon as the general partners began performing management services, they became legally entitled to these interests—the interests in effect vested. Under the applicable law, therefore, any subsequent owner of these interests would be entitled to the concomitant income. Moreover, if the partnership's separate working interest, but not the general partners' overriding royalty and working interest, had been sold, the former would have been subject to the continuing burdens of the latter.[115] For this reason, PLC desired to acquire all of the interests in the lease,[116] and, the Court holds, all the interests were properly conveyed to PLC within the terms of the Partnership Agreement and pursuant to California law. Therefore, the sales proceeds were properly allocated between the general and limited partners, and the $6.12 million the partnership received for the sale of its interest in the lease was distributed in accordance with the Partnership Agreement's provisions concerning distribution of assets upon dissolution. The $2.38 million allocable to the general partners' overriding royalty and working interest were not assets of the partnership and therefore not subject to the distribution of assets provision.

*Breach of Fiduciary Duty Claims*

Although plaintiffs' claim that defendants breached fiduciary duties owed to the

---

113. Tr. at 626 27.

114. Tr. at 652 53.

115. Tr. at 623 25.

116. Tr. at 150; JX 7. PLC did not wish to acquire Tenneco's landowner royalty. *See* notes 65 66 *supra* and accompanying text.

limited partners is framed in broad and unfocused terms, having reviewed the evidence, the Court believes that plaintiffs' claim can be categorized by reference to those allegations pursued by plaintiff at trial. Plaintiffs principally attempted to prove that the Tristar defendants breached the fiduciary duty owed by general to limited partners by (1) claiming an overriding royalty and working interest separate from the partnership's interest, which they then wrongfully assigned and recorded, and subsequently sold to PLC; (2) improperly valuing these separate interests, assuming they existed, for the purpose of the PLC sale; (3) overcompensating Clayton for the services it rendered; and (4) reimbursing Bryant $75,963 for expenses it incurred prior to the formation of the partnership.

Plaintiffs further contend that Clayton breached a fiduciary duty it voluntarily assumed with respect to the limited partners by acting in its own self-interest instead of in the best interests of the limited partners. To support this claim, plaintiffs attempted to prove that Clayton agreed with the Tristar defendants that it would try to persuade the limited partners that the proposed sale to PLC was fair and equitable as to the limited partners when in fact it was not, in return for the Tristar defendants' promise to pay Clayton an exhorbitant commission for its services. The Court will address these claims seriatum.

■■■ The California Court of Appeal recently considered the question of what duty is owed to the limited partners by the general partners in a limited partnership. In *Wyler v. Feuer*, 85 Cal.App.3d 392, 149 Cal.Rptr. 626 (1978), a dispute arose as to the nature of the defendant general partners' obligation, pursuant to a limited partnership agreement, to obtain production financing for a motion picture. The plaintiff limited partner had invested $1.5 million in the project and sought damages for the general partners' alleged mismanagement of the business. The court stated:

A limited partnership affords a vehicle for capital investment whereby the limited partner restricts his liability to the amount of his investment in return for surrender of any right to manage and control the partnership business. In a limited partnership the general partner manages and controls the partnership business. In exercising his management functions the general partner comes under a fiduciary duty of good faith and fair dealing toward other members of the partnership.

These characteristics—limited investor liability, delegation of authority to management, and fiduciary duty owed by management to investors—are similar to those existing in corporate investment, where it has long been the rule that directors are not liable to stockholders for mistakes made in the exercise of honest business judgment, or for losses incurred in the good faith performance of their duties when they have used such care as an ordinarily prudent person would use. By this standard a general partner may not be held liable for mistakes made or losses incurred in the good faith exercise of reasonable business judgment.

*Id.* at 402, 149 Cal.Rptr. at 632–33 (citations omitted).[117]

---

117. The Tristar defendants rely in part upon a provision in the Partnership Agreement for the proposition that they could not have breached their fiduciary duty to plaintiffs if they exercised their reasonable business judgment in good faith in performing the acts that precipitated this litigation. Section 9.05 of the Partnership Agreement provides:

The General Partners and their affiliates shall not be liable to the Limited Partnership for any liability or loss suffered by it; provided, however, that if such loss or liability arises out of any action or inaction of the General Partners, the General Partners shall not be liable to the Limited Partnership only if the General Partners determined, in good faith, that such course of conduct was in the best interests of the Limited Partnership, and only if such course of conduct did not in fact constitute gross negligence or gross misconduct by the General Partners.

This provision is, however, by its terms inapplicable to the instant claims. It sets forth the general partners' standard of liability with respect to the partnership, but does not set forth their standard of liability with respect to the limited partners. This distinction is critical, because the limited partnership as an entity

This "business judgment" rule seems somewhat at variance with the oft-stated California rule with respect to the fiduciary relationship between partners generally: "[E]ach partner must act in the highest good faith toward the other, and one must not take any advantage over the other by the slightest misrepresentation or concealment." *Skone v. Quanco Farms,* 261 Cal.App.2d 237, 241, 68 Cal.Rptr. 26, 29 (1968) (citations omitted); *accord, Laux v. Freed,* 53 Cal.2d 512, 2 Cal.Rptr. 265, 348 P.2d 873 (1960); *Nelson v. Abraham,* 29 Cal.2d 745, 177 P.2d 931 (1947); *Dennis v. Gordon,* 163 Cal. 427, 125 P. 1063 (1912); *Yeomans v. Lysfjord,* 162 Cal.App.2d 357, 327 P.2d 957 (1958). Although the Court believes that *Wyler v. Feuer* may have enunciated a new rule for limited partnerships, under either rule the Court finds that plaintiffs failed to establish that the Tristar defendants breached their fiduciary duty.[118]

### 1. The Tristar Defendants

The first of the four areas in which plaintiffs attempted to prove a breach of fiduciary duty by the Tristar defendants[119] is easily disposed of. The Court has previously found that the general partners properly claimed a separate overriding royalty and working interest, which was lawfully assigned and recorded and sold to PLC. Indeed, the assignments and recordations were made prior to Clayton's identifying PLC as a potential purchaser. Clearly, therefore, the Tristar defendants acted in good faith and reasonably and did not take advantage of the limited partners. More-

over, at trial, plaintiffs produced no credible evidence of concealment or misrepresentation by the general partners in any of the relevant documents or otherwise, at any time during the period the events at issue occurred.

Plaintiffs next claim that the general partners improperly valued their separate interests for purposes of the sale to PLC, thus depriving the limited partners of additional profit. The Court has previously explained in detail the valuation process, from the time that Holmes and Dubow first discussed the issue until they decided upon the exact amounts by reference to the Fox-prepared Schedules and revised projections, setting forth the estimated cash flow from operations and the prospective economic consequences of the various interests. The Schedules contained an estimate that the general partners would receive approximately 36.5% of the net revenues over the life of the program, and the revised projections contained an estimate that the general partners would receive between 27% and 52% of the net revenues over the life of the program. The evidence adduced at trial demonstrated that this procedure comported with the accepted methodology for establishing the relative value of the various oil and gas interests in a single property.[120] Once such relative values have been assigned, the parties can easily compute the appropriate percentage of proceeds from the sale of a combination of the various interests to be accorded each separate interest.

does not claim to have been injured, only certain limited partners as individuals claim to have been injured. Thus, the provisions of the Partnership Agreement are not dispositive on this issue.

118. Defendants argue that because the limited partners profited in the PLC transaction, plaintiffs suffered no harm as a result of the general partners' actions and that, as a consequence, plaintiffs cannot prevail on their breach of fiduciary duty claims. Although it is true that plaintiffs suffered no out-of-pocket damages, California applies a "benefit of the bargain" rule for the computation of damages in an action for breach of fiduciary duty. *See Purviance v. Shostak,* 90 Cal.App.2d 295, 297, 202

P.2d 755, 757 (1949); *Humburg v. Lotz,* 4 Cal. App. 438, 442, 88 P. 510, 511-12 (1906). Thus, whether plaintiffs actually suffered out-of-pocket damages is not relevant herein.

119. Because Bryant and Tristar are under the exclusive control of Lundquist and Dubow, respectively, the Court believes it is appropriate to place all four defendants on the same footing with respect to potential liability for breach of fiduciary duty, despite the fact that Lundquist and Dubow were not themselves general partners.

120. Tr. at 429-30, 456-57, 526-27, 620-23.

In the instant case, the Tristar defendants not only adopted the above methodology, but they also adjusted downward the percentage the general partners would receive for their overriding royalty and working interests, when informed by Clayton that if the general partners received one-third of the sales proceeds for these interests as well as 10% of the distributable assets of the partnership upon dissolution, as provided in the Partnership Agreement, they would receive a total of approximately 40% of the proceeds. In order that the general partners' percentage would more closely approximate their projected net revenue over the life of the program, the Tristar defendants caused the general partners to reduce the amount they would receive for their overriding royalty and working interests to 28% of the total proceeds. In light of the fact that the Fox revised projections indicated that the general partners' share of net revenues over the life of the program could reach 52%, the one-third valuation figure was conservative, and as such was found by Clayton to be fair and reasonable to the limited partners.

■ The Court finds that, with respect to the valuation of the general partners' separate interests and the consequent allocation of the sales proceeds, the foregoing facts demonstrate that the Tristar defendants exercised their reasonable business judgment in good faith and did not take advantage of the limited partners.[121]

■ Next, plaintiffs contend that the Tristar defendants arranged for the alleged overcompensation of Clayton for the services it rendered in connection with the sale to PLC. The evidence adduced at trial established, however, that (1) there was no industry-wide standard fee for negotiating transactions of this nature, (2) the amount of the fee was freely negotiated between Clayton and the general partners at arm's length, (3) the fee was reasonable under the circumstances, and (4) payment of the fee was fairly allocated between the general and limited partners based on their proportionate shares of the sales proceeds. Accordingly, the Court finds that the Tristar defendants did not breach their fiduciary duty to the limited partners in this area under either formulation of the California fiduciary duty rule.

■ Finally, plaintiffs contend that the general partners breached their fiduciary responsibilities by reimbursing Bryant $75,963 for preformation expenses, and permitting Bryant to retain this money for five months without paying interest to the partnership. The evidence showed, however, that (1) Bryant actually incurred these expenses, (2) the general partners honestly believed that Bryant was entitled to reimbursement, (3) when advised by Fox that the Memorandum did not provide for such reimbursement, the general partners immediately advised the limited partners of the same, and (4) the general partners repaid the $75,963 in full. The Court finds that under these facts the general partners did not breach their fiduciary duty to the limited partners under either formulation of the California fiduciary duty rule.[122]

---

**121.** Plaintiffs also claim that the Tristar defendants breached their fiduciary duty by valuing the separate interests based on projections and assumptions provided by Simm, who plaintiffs claim was biased because of his financial interest in Bryant. *See* note 13 *supra.* This overlooks the fact that the cash flow projections were based initially upon the report of an independent petroleum engineering company, Evans & Carey, *see* note 40 *supra* and accompanying text, and that once the amount of recoverable oil was estimated, the assigning of a percentage value to each of the various interests was merely the result of an accounting procedure whereby Fox calculated the cash flow to each interest based on the Partnership Agreement. The key figures, then, are the estimated amount of recoverable oil, determined by Evans & Carey, and the size of the overriding royalty and working interests, established by the general partners. Because Simm was not responsible for either, plaintiffs' contention on this point is not supported by the evidence and is thus rejected.

**122.** The Court adheres to this conclusion in the face of plaintiffs' claim that by withholding the interest earned on the $75,963, the Tristar defendants breached their fiduciary duty, because the Court believes that the actions taken by the general partners when they learned of Bryant's good faith mistake were all that were necessary

## 2. Clayton

The Court agrees with plaintiffs that because Clayton introduced the general partners to a prospective buyer, actively assisted in the ensuing negotiations, helped prepare the proxy materials sent to the limited partners in advance of the June 23, 1980 meeting, and offered to prepare and issued an opinion as to the fairness of the sale to the limited partners, Clayton voluntarily assumed a position of trust and hence a fiduciary duty toward the limited part-- ners. *See Humburg v. Lotz*, 4 Cal.App. 438, 88 P. 510 (1906). Plaintiffs claim that this duty was breached when Clayton was paid an exorbitant fee as a quid pro quo for rendering a fairness opinion.

Initially, as the discussion above with respect to the Tristar defendants indicates, the fee negotiated between the general partners and Clayton was not excessive. Nevertheless, even the acceptance of a reasonable fee, if paid as a quid pro quo for rendering a fairness opinion, would be a breach of fiduciary duty because it would establish that Clayton was not acting in good faith. *See Wyler v. Feuer, supra; Skone v. Quanco Farms, supra.*

Plaintiffs failed to prove this allegation at trial. The evidence showed that Clayton acted in the best interests of the limited partners, many of whom were valued customers,[123] by carefully reviewing the relevant documents, consulting with experts and its own counsel, and only then offering its opinion. The Court does not accept the inference urged by plaintiffs that Clayton could not have acted in the best interests of the limited partners because of its financial stake in the proposed sale. The credible evidence is to the contrary[124] and there was no other evidence that any of Clayton's personnel were in any way improperly motivated.

Moreover, Clayton's services to the limited partners in connection with the sale to PLC were simply a continuation of the role it played during the offering period. Holmes had persuaded Lundquist not to withdraw from the offering despite the fact that Bryant had received substantial offers to sell the property. Clayton suspended sales of partnership units when it learned of PLC's interest, which had the effect of preventing the dilution of the existing subscribers' interests. Holmes also insisted that the fairness of the percentage valuation of the various interests be confirmed by independent accountants, and that the latter make revised projections in the event an agreement to sell was reached. After reviewing those revised projections, Clayton determined that as the allocation was then structured, the general partners would receive close to 40% of the sales proceeds after dissolution, and persuaded the general partners to reduce the share of the proceeds allocated to the overriding royalty and working interests so that their total share would be approximately one-third. Holmes also played an important role in persuading PLC to return to its $8.5 million offer after it had reduced its offer to $6.5 million in April 1980. Finally, Holmes recommended that payment by PLC be made in installments to spread the limited partners' taxable gain over two years.

The foregoing evidence compels the conclusion that Clayton did not act in its own interest to the exclusion of the limited partners' best interests. Rather, it supports the finding of a lack of a quid pro quo, in the absence of any evidence to the contrary.[125]

---

to satisfy their fiduciary responsibilities to plaintiffs.

123. Tr. at 218.

124. Tr. at 160, 188.

125. Plaintiffs also claim that Clayton breached its fiduciary duty by failing to retain its own petroleum engineer to verify Simm's production projections, failing to compel Bryant to pay interest on the $75,963 it retained in the good faith belief that it was entitled to reimbursement for preformation expenses, and failing to protect the limited partners against possible adverse tax consequences by not structuring the PLC transaction on a capital gains basis. The Court rejects each of these claims because plaintiffs failed to produce any evidence that Clayton was under a duty to perform these functions or even that it could have performed them had it desired to do so.

More important, the evidence supports a finding that Clayton acted in good faith at all times in exercising its reasonable business judgment, and at no time did it take advantage of the limited partners.

## CONCLUSION

In accordance with the foregoing, after a trial on the merits of plaintiffs' amended complaint, the Court finds for defendants. The amended complaint is dismissed.

The Court reserves decision on defendants' counterclaim. Defendants are directed to brief the issues raised therein by December 7, 1981, and plaintiffs are directed to respond by December 14, 1981. The Court will instruct the parties further at that time.

These are the Court's findings of fact and conclusions of law. Fed.R.Civ.P. 52(a).

SO ORDERED.

---

Plaintiffs also claim that Clayton breached its fiduciary duty when Holmes wrote the word "stronger" in the margin of the last page of a draft of the proxy materials, dated February 29, 1980. PX 6; *see* Tr. at 90-91. The paragraph next to which "stronger" appears states in substance that Clayton believed that the distribution of proceeds from the PLC transaction was fair and equitable to the limited partners. The Court notes that the word has apparently been crossed out and that at trial Holmes did not recall the significance of the notation. Tr. at 90-91. Moreover, the Court rejects the inference that this notation evidenced Clayton's quid pro quo arrangement with the general partners, in light of the Court's other findings with respect to Clayton's conduct during this time period.